ELIZABETH CASPARI, Respondent, *v.* THE FIRST GERMAN CHURCH OF THE NEW JERUSALEM, Appellant.

### June 6, 1882.

1. A gift made through the solicitation of one sustaining confidential relations to the donor must be free from the least taint of fraud.

2. A presumption of fraud arises from the existence of confidential relations between the donor and the donee.

3. It is incumbent on a donee who sustains confidential relations to the donor to show that the donor had competent, disinterested advice.

4. A gift disproportioned to her means, made by an aged widow, to a church, at the solicitation of the pastor thereof, who was also the donor's spiritual and business adviser, without disinterested advice from others, upon the condition, subsequently repudiated by the donee, that she was to receive interest thereon during her life, will, at her suit, be set aside.

APPEAL from the St. Louis Circuit Court, ADAMS, J.
*Affirmed.*

KEHR & TITTMANN, for the appellant : Advice, persuasion, or entreaty does not constitute undue influence, and will not vitiate a gift made freely and from conviction of its propriety, though such gift might never have been made but for such advice, persuasion, or entreaty. — *Howe* v. *Howe*, 99 Mass. 99 ; *Children's Aid Society* v. *Loveridge*, 70 N. Y. 394 ; *Gardiner* v. *Gardiner*, 34 N. Y. 155 ; *Breck* v. *Breck*, 66 N. Y. 144 ; *Barnes* v. *Barnes*, 66 Me. 297 ; *Brown* v. *Molliston*, 3 Whart. 129 ; *Zimmerman* v. *Zimmerman*, 23 Pa. St. 375 ; *Thompson* v. *Keyner*, 65 Pa. St. 368 ; *Daniel* v. *Hill*, 52 Ala. 430 ; *Joe* v. *McCord*, 74 Ill. 44 ; *Miller* v. *Miller*, 3 Serg. & R. 267 ; *Tawney* v. *Long*, 76 Pa. St. 106 ; *Rall* v. *Graham*, 43 Ind. 1 ; *Sutton* v. *Sutton*, 5 Kan. 459 ; *McDaniel* v. *Crosby*, 19 Ark. 533. Assuming that the relation of spiritual adviser and advisee existed between the plaintiff and the pastor at the time of the gift to the church, the plaintiff claims that the gift must be presumed to be invalid under the rule of evidence established

by the following Missouri cases. — *Garvin* v. *Williams*, 44 Mo. 465; *s. c.* 50 Mo. 206; *Cadwallader* v. *West*, 48 Mo. 483; *Yosti* v. *Laughran*, 49 Mo. 594; *Street* v. *Gross*, 62 Mo. 228; *Ranken* v. *Patton*, 65 Mo. 378; *Bradshaw* v. *Yates*, 67 Mo. 228; *Ford* v. *Hennessey*, 70 Mo. 580; *Miller* v. *Simmonds*, 5 Mo. App. 33. To enable the congregation to buy the new church building, plaintiff did in advance what she had at all times intended to do at her death. She made the gift to take effect immediately, instead of postponing it to the time of her death. — *Bowles* v. *Wathan*, 54 Mo. 261. The church contends that it never made a promise to pay interest, although such was the understanding between the plaintiff and Dr. Carriere. The interest clause was left out of the deed of gift by her consent; the obligation, if any, is, therefore, a moral, and not a legal obligation. But treating it as a legal obligation, the failure to comply with the promise does not avoid the gift. — *McKane's Executor* v. *Bonner*, 1 Bailey, 113; *Fonty* v. *Fonty*, 34 Ind. 133; *Long* v. *Woodman*, 58 Mo. 49–53; *Hazlett* v. *Burge*, 22 Iowa, 535; *Gallagher* v. *Brunell*, 6 Cow. 346; *Gage* v. *Lewis*, 68 Ill. 616; *The State* v. *Pruther*, 44 Ind. 287; *Schaeffer* v. *Muenchen*, 7 Mo. App. 563.

BRECK JONES, for the respondent: The relation which the person at whose solicitation the gift in this case was made, sustained to the donor, raises a presumption of fraud. — *Ormand* v. *Hutchison*, 13 Ves. Jr. 47; *Hatch* v. *Hatch*, 9 Ves. Jr. 292; *Huguenin* v. *Baseley*, 14 Ves. Jr. 299 (leading case); *Harvey* v. *Mount*, 8 Beav. 452; *Welles* v. *Middleton*, 1 Cox, C. C. 112, 125; *Meek* v. *Perry*, 36 Miss. 190. The presumption is stronger in the case of a minister of religion than in any other of the confidential relations. — Sir Samuel Romilly's reply in *Huguenin* v. *Baseley*, *supra*; Adams' Eq. 184; *Norton* v. *Reilly*, 2 Eden, 286; *Nachtrieb* v. *Harmony Settlement*, 3 Wall. Jr. 56. This presumption throws upon the donee the burden of showing, by the clearest evidence, that the gift was the

deliberate offspring of the donor's own unbiased mind, and flowed from a free and uninfluenced volition. — *Harvey* v. *Sullens*, 46 Mo. 147; *Cadwallader* v. *West*, 48 Mo. 502; *Garvin* v. *Williams*, 50 Mo. 206; *Greenfield Estate*, 14 Pa. St. 489; 1 Story's Eq. Jur., sect. 311. The gift was improvident. — *Dent* v. *Bennett*, 4 Myl. & Cr. 273. And was made without having disinterested advice. —*Cadwallader* v. *West*, 48 Mo. 483; *Ford* v. *Hennessey*, 70 Mo. 580. The donor was aged and infirm. — *Anderson* v. *Elsworth*, 3 Giff. 154. The deed of gift made a false recital as to consideration. — *Heever* v. *Wyatt*, 3 Bro. C. C. 156; *Gibson* v. *Russell*, 2 You. & C. 204; *Shark* v. *Leach*, 31 Beav. 49. It matters not that the pastor did not receive the benefit of the gift. Whoever received it took it tainted and infected with the undue influence and imposition of the person procuring it. — *Yost* v. *Laughran*, 49 Mo. 599; *Ranken* v *Patton*, 65 Mo. 387; *Ford* v. *Hennessey*, *supra*. When the point is fully discussed, the acquiescence of the donor is of no importance, while her situation remains unchanged. — *Hatch* v. *Hatch*, 9 Ves. 292; *Yowland* v. *DeFaria*, 18 Ves. 20.

Thompson, J., delivered the opinion of the court.

This is a suit in equity to set aside a deed of gift made by the plaintiff to the church of which she was a member. The church in question is an incorporated religious society known as the First German Church of the New Jerusalem. At the time of the making of the gift, the plaintiff was a widow about seventy-two years of age, infirm in body and feeble in mind, though she had been a person of good intelligence. She had long been a member of this particular religious denomination, and of this particular society. In fact, it was organized in her house some forty years ago, soon after she came to this country from Germany, and during the first year of its existence, the little congregation used her house as their place of worship. The evidence tends to show that she was greatly attached to the church, and that she and

her husband had for some time contemplated making a donation to it. Their family consisted, prior to the death of the husband, of husband and wife, and three sons of the husband by a former marriage. One of these sons, the eldest, was dissipated, and, at the time of the trial, was still dependent upon his aged step-mother for his support. The other two were able to take care of themselves, though, we infer, they were not well thought of by their father; for he died leaving a will in which he disinherited all three by bequeathing them $1 each. We say "disinherited," but this expression should be taken with the qualification that, so far as the evidence shows, he left no property upon which his will could have operated. The only specific bequest contained in this will was the sum of $3,000 to his wife, the present plaintiff, to be enjoyed by her during her life time, and, at her death, to go to the defendant church. The residue of his property was devised to his wife and to her heirs and assigns, without any limitation or condition. This will was executed in the year 1872, and he died in the year 1875. It seems that he died leaving substantially nothing. Nothing came from him to the plaintiff under the will, out of which the church could hope to realize the bequest of $3,000 after her death.

Mrs. Caspari, however, had long contemplated leaving a legacy to the church; and this desire on her part will explain the peculiar circumstances of his leaving such a will, having no property on which it could operate. Mrs. Caspari and her husband had, it seems, agreed with each other so to make their wills as to leave $3,000 to the church; and, in their ignorance of the law, as we are bound to infer, they supposed that the proper way in which to do this, was for Mrs. Caspari to leave a legacy to him of $3,000, in her will, and for him in his will to bequeath it back to her for her life, remainder to the church; and it seems that such wills were made. But this arrangement was broken into by the circumstance that Mr. Caspari died first, so that he left

nothing on which his will could operate. When Mr. Caspari died, Mr. Gustave Morgens, also a member of the church, became Mrs. Caspari's confidential business adviser. Fears now arose on the part of the pastor and some of the leading members of the church, that in case Mrs. Caspari should die, the money would be lost to the church. So the pastor went to see her about it, and she told him that it was all right; that she and Mr. Morgens had arranged the matter. He also went to see Mr. Morgens, who told him that the necessary steps to secure the bequest to the church had been taken. Trusting in this, they gave themselves no further concern about the matter until Mr. Morgens died, when it was found that nothing had been done to secure the bequest to the church.

When Mr. Morgens died, the pastor became Mrs. Caspari's business adviser. Such matters of business as she could attend to herself, such as paying taxes, receiving rents, and the like, she attended to in person; but, as she could not write in English, when it became necessary to write receipts, he wrote them for her. He also took charge of and kept her chief papers relating to her property, and he testifies that in business matters she generally followed his advice.

The discovery of the fact that Mr. Morgens had died without taking steps to secure the bequest to the church, stimulated the pastor to persuade Mrs. Caspari to put her intended bequest into the form of a promissory note; he thinking, that if it were done in that way, her heirs would be less likely to succeed in setting it aside, than in case it should take the form of a provision in her will. Moreover, it was no doubt thought that, if she should make it as a bequest in her will, the influence of her step-children, or other circumstances which might arise, might induce her to revoke it. It was, therefore, thought desirable to put it in the form of an executed gift; and, accordingly, the pastor and two influential members of the congregation per-

suaded her to sign a promissory note of $3,000. This note was in absolute form, dated April 21, 1877, payable twelve months after date to the defendant; and it was expressed on its face that it was " for value received."

The circumstances under which this note was given ought to be noticed. In the first place, it is clear that the note would not have been given but for the persuasions of the pastor. He had frequent conversations with Mr. Schloeman, the treasurer of the church, in which the fact was discussed that Mr. Caspari had left no estate from which the bequest of $3,000 could be paid. In these conversations the pastor adverted to the fact that, although Mrs. Caspari had made a will, yet she had made no provision therein for the church. It seems that other members had acquired knowledge of this fact, and had become anxious that Mrs. Caspari should do something, so that, in case she should suddenly die, the church should receive the money spoken of. Finally, Mr. Schloeman urged the pastor to call upon Mrs. Caspari, and, if nothing else could be obtained, to get a note from her, he himself refusing to go. The pastor went and persuaded Mrs. Caspari to execute the note. He says in his testimony : " I went and saw her and requested her to give the money during her life time, which she refused. * * * I went and persuaded her to give us a note. * * * She never thought of giving anything during her life time, or anything until I spoke to her. I told her she had made no provision in her will ; and in case she should die, the church would get nothing, and it was right she should do something for the church, as she had spoken of it before. I told her the church was nearer to her than anybody on earth ; and for that reason she should do whatever she thought proper. Then she answered : 'Well, I want to do what is right, and you know what is right, and you do what is right for me.' After that we concluded to write out such a note."

When the plaintiff had thus consented to give the note,

the pastor and Mr. Schloeman seem to have thought it best not to have the transaction take place in her house, because her step-children and some other persons who lived there, might know of it. The fact of the gift was to be kept secret. Accordingly, she was invited, on a certain evening, to the pastor's house, there to execute the note. Mr. Schloeman and Mr. Prange, another influential member, were invited to be present and witness the transaction. The latter member brought his wife with him. They all met at the pastor's house in his dining-room. After they had been there for a short time, the pastor invited the two brethren and Mrs. Caspari into his office and closed the folding-doors, shutting out of the conference the pastor's wife and Mrs. Prange. The note was there written as already described, was signed by Mrs. Caspari, who handed it to the treasurer for safe keeping. It was indorsed by Mr. Schloeman and by Mr. Prange, as explained by the testimony of the latter, " to make the note show it had to be paid." Mr. Prange testifies that the pastor " told her that if she did not receive any material value, she received value from the spiritual mother ; and this note was not to be paid so long as she was living, but after she was dead we wanted to collect it." With reference to what was said to her while the four were thus closeted together, the pastor also testifies : " I told Mrs. Caspari that she would, by signing that note, give the note to the church, in trust of Mr. Schloeman, Mr. Prange, and myself, to hold it for a certain ' value received.' The note was written just as if she had received that value, and in case she should die, Mr. Schloeman, Mr. Prange, and myself would be able to go to court and claim that amount of money from her estate. * * * There was no consideration for that note. * * * We explained the effect of the note to be that, after her death, in case she should die suddenly, before other preparations were made, we should have some right to call for that much money. We explained to her that the money was never to

be payable until after her death.   *   *   *   I told her that she had not really received any material value, but that we could rightfully say she had received a value, because she had received spiritual education and cultivation in the church, consequently a value from the spiritual mother. The church is so called in the new church."

The pastor testifies that he did not indorse the note, with the other two brethren, because he did not wish his handwriting to appear in the transaction. He says: " I knew from other cases reported in the papers — I remember one of a Catholic bishop who had been called to the stand to testify whether he had anything to do with the case, and he testified he had. I found there a will, I think it was, was annulled on that account; and for that reason, I did not want anything to do with it, besides the conversations." For the same reason, he had his wife copy at various times other writings connected with the gift. " I did not," says he, " want anybody to know that I had written them. I feared it might have too strong an influence against the gift."

When the note was thus executed, indorsed, and delivered to the treasurer, the folding-doors of the office were thrown open, and it was announced that Mrs. Caspari had done something for the church. The pastor's wife brought out a bottle of wine; the treasurer proposed a toast, and they all drank " to the health of Mrs. Caspari, that she may live long and do many good things for the world yet."

Afterwards a fear came into the minds of the pastor and the treasurer of the church, that even the giving of this note · might not be sufficient to enable them to get the money after Mrs. Caspari's death. " I spoke of it," says the pastor, " that in case we should present that note to the court, we might be asked what was the value Mrs. Caspari received, to which we, of course, could not answer. We knew she had not received any money, nor anything else, in the worth of material things, for which the note was executed.

Thinking this note might not hold as good as we at first thought, Mr. Schloeman, the treasurer, asked me to go to Mrs. Caspari's and see if we could not make some other arrangements, because he himself did not want to speak to her. The excuse he gave was that the neighbors would wonder what he wanted there, and it was more proper for me to go and do this work. Then I went to Mrs. Caspari and told her she might give that money during her lifetime. She says : ' But I want to draw my interest ; I cannot give it up during my lifetime ; I need the interest of my money.' When she said she wanted to draw the interest on that money during her lifetime, I proposed to her that the congregation might draw the interest and pay it to her. I told her there was no doubt the congregation would be quite willing to receive the money at present, and I told her at the same time : ' The money will not be given to the corporation unless you receive the promise from the congregation ' — that the interest would be paid her during her lifetime, * * * so that in case of her death, her step-children would not be able to contest her will, which it was feared at that time they would do, * * * in case that she would make one and will it to the church. When I told her about this, she repeated, ' But I want my interest.' She said : ' Now, if I would give the money to the church, and the interest would not be paid me, what then ? ' I says : ' These people are honest enough to pay you your interest if they promise to, and the money would not be paid to them, unless they gave to you that promise.' I said : ' In case there may be some that could not be fully trusted, the majority will always pay you what they promise.' ''

Now, it does not appear that Mrs. Caspari had any money at that time, but she had a note of Gustav Morgens, dated February 16, 1876, for $4,000, payable to her order four years after date, with interest from date at seven per cent per annum. It occurred to the pastor that, although this note was for $1,000 in excess of the amount which Mrs. Caspari

intended to give the church at her death, and which amount was represented by the $3,000 note, which she had already given them, yet if they could induce her to give them this note, the donation would take more nearly the form of an executed gift, which could not be revoked by her during her lifetime, nor impeached and set aside by her heirs after her death. He, therefore, set about to persuade her to give up this note. "I suggested to her," continues he, in his testimony, "that she might give the note of $4,000. She says: 'But that is $4,000; I intended to give you $3,000 only; I might use the other thousand — the fourth thousand.' I told her: 'Then if you draw the rent from your houses and the interest from the $4,000, you will have all that you need, and you could just as easily give the $4,000.' Well, she was not willing at first, but after speaking to her some time and occasionally, she consented to give this note. * * * She consented, with the condition that she would trust the note of $4,000 to Mr. Schloeman, Mr. Prange, and myself, that we might hold it, and, as to her interest, that she would draw it during her lifetime. We were to say nothing about it, and we were not to give it to the church, nor tell the church that any such note was in our hands; that we were not allowed to give this note to the church at any time unless the promise was given by them that the interest would be paid to her; but that in case she should die, then we (Mr. Schloeman, Mr. Prange, and myself) would draw that money and pay it to the church. With this condition she signed her name on the back of the note."

As in the case of the $3,000 note, the meeting at which this $4,000 note was indorsed by Mrs. Caspari and turned over to these gentlemen for the church, took place in the evening, at the pastor's house. It was arranged that it should take place there, because Mrs. Caspari did not want anyone at her house to know anything about the affair. Her eldest step-son was living with her at the time, and a tenant was living in a separate part of her house. Again the

four parties—the pastor, Mr. Schloeman, the treasurer, Mr. Prange, and Mrs. Caspari—retired to the pastor's study; again the folding-doors were closed, leaving the pastor's wife and child and Mrs. Prange in the other room. This was done before they commenced talking about the business. "Why did you go out of the room?" the pastor was asked, when testifying as a witness; and he answered, "Because we wanted to be alone in the room when we did this; * * * because we did not want the thing known. We did not want anything said about it; we did not want anybody to notice—the children or anybody to notice it, so it could be kept among ourselves."

There is a conflict of testimony as to whether the $3,000 note was there destroyed or restored to Mrs. Caspari. Mr. Schloeman, the treasurer, testifies that he brought it with him, and delivered it to Mrs. Caspari at the meeting at which the $4,000 note was turned over to them. Mrs. Caspari, on the contrary, testifies that she does not recollect that she ever received it back. The recollection of Mr. Schloeman and Mrs. Caspari are both very deficient as to matters of detail. Mr. Prange testifies pointedly, after being informed that Mr. Schloeman had testified to the contrary, that the note was not produced at the meeting and was not given up. The pastor testifies to the same thing, and with more emphasis. He says that Mr. Schloeman did not bring the $3,000 note to the meeting. "He told me he would keep it for a while; that, in case the $4,000 note might not prove very good, the $3,000 note was there to fall back upon."

We may now take another step in this history. The fact that Mrs. Caspari had given this $4,000 note to the church was, as yet, known only to the pastor, to Mr. Schloeman, and Mr. Prange. And now, about two months after the giving of the note, as the pastor testifies, he discovered an opportunity to purchase a new church edifice, which the society needed. He communicated this to some of the mem-

bers. As the society had not money enough to pay for it, the inquiry arose as to where the necessary money was to come from. Then the pastor felt at liberty to make known the fact of this gift, and the terms upon which it had been made, namely, the payment of interest to Mrs. Caspari during her lifetime. Mrs. Caspari favored buying the church, and so he assured the members of the congregation that the gift might be relied upon to help them out, provided they would agree to pay interest to her during her lifetime. He testifies that they all so agreed.

One of the members, to whom the fact of the gift of this $4,000 note had been communicated, Mr. Detzel, urged the necessity of Mrs. Caspari putting her donation in the form of a deed of gift. At his request the pastor asked Mrs. Caspari to execute a deed, assuring her that it would not be to her injury, and repeatedly promising her that she would have her interest during her lifetime. He says : "I told Mrs. Caspari that it was thought the note might not be full security, and a deed of gift was desired, and it would not be to her injury, because it was only to secure the money for the church, so that her children could have no right to come and claim it in case she should die. Then she said : 'But I want my interest.' I said : 'Yes, you shall have your interest; that will be the consideration.' The thought was, we were all satisfied. No one objected. I made her the promise, 'You shall have your interest;' and with the promise that she should have her interest, which she asked for hundreds of times, perhaps, if any, then she consented that I might draw up such a deed of gift, which I did. I was not told by her how to draw it. She just trusted in me that I would write it as well as I was able. She never doubted their honesty connected with this ; she always thought that the people were sufficiently honest to keep the promise. I wrote the deed of gift and gave it to her." And so the deed of gift was drawn up by the pastor in his own handwriting. A copy was made by the pastor's wife,

and this was signed by Mrs. Caspari. The reason why the deed was in the handwriting of the pastor's wife, was thus expressed by the pastor: "Because I did.not want my handwriting to go out; I did not like to have it in my handwriting." No lawyer was consulted, but the original draft was made by the pastor from a book of forms brought by Mr. Detzel. It was then taken to the president of the congregation, Mr. Klages, and Mrs. Caspari informed him of the condition upon which she had given it, saying, as she had said so often, "But I want my interest." The deed was then taken to a notary and acknowledged. It is in the following language: "Know all men by these presents, that I, Elizabeth Caspari, of St. Louis, Missouri, now residing at 2101 Broadway, in consideration of the love and affection which I have and bear for the First German Church of the New Jerusalem, in St. Louis, and also for divers other good causes and considerations; and, whereas, said church, to my great satisfaction, and in part on my advice and recommendation, has purchased the property on the northwest corner of Twelfth and Webster Streets, I, the said Elizabeth Caspari, have given, granted, and confirmed, and by these presents do give, grant, and confirm unto the said First German Church of the New Jerusalem, in St. Louis, a note for the sum of $4,000, as hereinafter described, with all the rights and privileges thereunto belonging. Said note is dated St. Louis, February 16, 1876, and was given by G. Morgens, of St. Louis, Missouri, to me, the said Elizabeth Caspari, for the sum of $4,000, payable four years after date; and was by me, the said Elizabeth Caspari, claimed in the probate court of this city, against the estate of the late G. Morgens, on the twenty-fourth day of September, 1877. Said First German Church of the New Jerusalem, in St. Louis, to have, hold, and enjoy the same, to draw from the estate of the said G. Morgens the money for said note, to the only proper use and behoof of the said First German Church of the New Jerusalem, in

St. Louis, her executors, administrators, and assigns for-
ever. I, the said Elizabeth Caspari, have put the said First
German Church of the New Jerusalem in St. Louis, in full
possession of the above described note, with all the rights
and privileges thereunto belonging, by delivering said note,
together with this deed of gift, to Henry C. Klages, at
present the president of said church; said church to hold
and enjoy said gift forever, to use the same for the purpose
of paying off the debt of said church, and for such other
uses as said church may deem necessary."

It will be observed that nothing was said in this deed of
gift about interest. This was not put in, as the pastor says,
" because it was feared by the whole congregation that if
the congregation would pay the interest, the children might
come and say it was only borrowed money. So the words
mentioning about interest were left out on purpose, so that
no one would have a claim on the money. * * * We
told her that we had left out the interest clause, on account
of any trouble after her death, so that no one should have
any claim on the money after she died. At the same time
it was told her that the interest would be paid her, although
it was not mentioned in the paper."

The pastor put the deed of gift on record, and after this
had been done, he presented the deed of gift and note at a
meeting of the congregation, and this is his narrative of what
took place: " I went to the meeting of the congregation,
showed them the papers I had in my hands, and told them
that such a deed of gift had been drawn, had been signed,
and recorded; that, according to the deed of gift, the gift
was a full gift, but that Mrs. Caspari claimed to draw her
interest during her lifetime; that there was no mention
made of interest in the deed of gift on purpose, but I wanted
the congregation to know that, though there was no men-
tion made of interest in the deed of gift, it was desired and
conditioned by Mrs. Caspari, that she should have her in-
terest. * * * The understanding was, that the congre-

gation would draw the interest from the maker of the note, or from any person whom the money might afterwards be loaned to.   *   *   *   In case the congregation should use the money themselves, then the congregation would pay the same interest she would draw from the same amount of money elsewhere.   This condition I plainly stated.   It was a full meeting of the congregation, the majority of members being present.   Then it was put to a vote, and I told them : 'It is recorded and all proper, and you can only get the deed of gift in your possession, if you pass a resolution that you accept the present with the condition of paying Mrs. Caspari, during her lifetime, the interest on $4,000.'   That vote was passed, that the congregation would receive the gift with the condition of paying interest to Mrs. Caspari during her lifetime.   After they passed the vote, I surrendered the note and deed of gift to the congregation."   This statement as to what took place at the meeting is supported by the testimony of Mr. Prange.   He says : " Dr. Carriere brought the deed of gift, and says that Mrs. Caspari had a deed of gift made, but she wanted the interest during her lifetime ; and, if the congregation was satisfied with it they could have the deed of gift with the note, and the president of the congregation took the votes ; a vote was passed to give Mrs. Caspari interest during her lifetime. There was nothing said then about anything."   On the other hand, several members of the congregation, testifying for the defendant, deny hearing anything said about paying interest ; but none of them deny that Mrs. Caspari was to be assisted by donations from the congregation.   We apprehend that the true solution of this conflict of testimony will be found in the statement of Mr. William B. Morgens, one of the most considerate witnesses for the defence.   He says : " There was a promise made to her, but not in the form of interest — in the form of a donation.   That was what I heard from others.   I was not present ; I heard it from

people who speak the truth, that she will always get something. We do not owe her interest."

We are satisfied from the whole testimony, that this note which drew interest at the rate of seven per cent per annum, was given to the church upon the condition that the donor should enjoy the interest which would accrue from the amount of money which it represented, during her life ; that the society understood that the gift was made upon this condition ; that they accepted it with this understanding ; but that, in order that it should have the appearance of an out-and-out gift, and not that of a loan, an effort was made to avoid the appearance of paying interest, or to avoid making any admission of a liability to pay interest.

We ought here to notice the testimony of William B. Morgens as to what was done by him when he first learned that Mrs. Caspari had given the $4,000 note to the church. He was the administrator of his brother Gustav Morgens, deceased, the maker of this note. He was a member of the congregation, though it seems he was not a regular attendant of the business meetings ; he was a friend of long standing of Mrs. Caspari — her countryman, as he calls it, for they came from the same town in the old country. When he learned that she had made this gift, he wanted to be satisfied of two things : *First*, that the gift was entirely voluntary on her part ; and, *secondly*, that this was made in such a form that he would be justified in recognizing it as administrator of Gustav Morgens's estate. He says : " When I first heard about the gift I was not satisfied, and I went to her and asked her if she had given the money of her free will, and if she was influenced, and if she would not need the money. She said she had plenty of money as long as she lives, and the step-children would get plenty when she dies. Her step-children at the time were of no account, and she did not want them to have the money, and that was the reason she gave it to the church. I asked her if any-

body influenced her to do this, and she said no, that she did it out of her love to the church, and she wanted the church to have the money.    Another time I was present, and Mr. Klages, the president of the congregation, repeated the same questions to her in the same way, and she stated everything the same way again.''

Mr. Morgens also told the pastor that he must have a written order from Mrs. Caspari before he would pay the money over to the church.    Accordingly the pastor dictated a letter to his wife from Mrs. Caspari to Mr. Morgens; the pastor's wife wrote it out, and then the pastor obtained Mrs. Caspari's signature to it, and handed it over to Mr. Morgens.    The pastor testifies that he did this in pursuance of a request from Mr. Morgens, to get such paper for him. This letter was as follows : —

"ST. LOUIS, February 26, 1878.
" *Mr. W. B. Morgens, Administrator of the estate of the late Gustav Morgens.*

" DEAR SIR : I, Elizabeth Caspari, herewith wish to notify you, that on the thirteenth day of February, 1878, I gave to the First German Church of the New Jerusalem, in St. Louis, the note of $4,000 which I held against the estate of the late Gustav Morgens, and which is dated St. Louis, February 16, 1876 ; and I, Elizabeth Caspari, do herewith instruct and authorize you to pay said note and interest thereunto the said First German Church of the New Jerusalem in St. Louis.

" [Signed by]    ELIZABETH CASPARI."

The pastor testifies : " The whole contents of the paper were my production, and the statement that the interest was to be paid to the church was made so that this also would agree with everything else ; that the whole thing should take the appearance as if the gift was presented without a condition.    That was our thought and our way of acting, to put the whole thing under such an appearance, and keep

strangers under such an impression that there was no condition made, but the members of the church did know the condition."

We now come to the circumstance which, no doubt, chiefly led to the bringing of this suit. After the church had made itself certain of realizing the money from this gift so as to enable it to pay for its new edifice, namely, in the summer of 1878, there arose a quarrel among the members of the congregation over the question whether the pastor, Dr. Carriere, through whose influence and exertion this important gift had been obtained for the church, should be retained as their pastor or be discharged. There was a meeting at which a majority voted to request his resignation. Then his friends rallied at another meeting, found themselves in the majority, and rescinded the vote. Afterwards, at another meeting, there was a majority against the pastor; he then resigned, and with those who sided with him, established a new congregation. Among those who sided with him was Mrs. Caspari. Her testimony shows that she felt and feels greatly aggrieved at the proceedings which compelled his resignation. She regarded those proceedings as dishonorable; she pronounced them a shame; she could remain no longer with those who were the authors of them. This was the substance of her testimony upon this subject. Of course the testimony as to this church quarrel does not go at all into details, beyond showing that the subject of the quarrel was the pastor; nor would this have been proper. We are, therefore, not authorized to attach blame to one side or to the other. But the quarrel arose; it resulted as we have stated, and it produced in the breast of Mrs. Caspari the feelings we have stated.

When this quarrel arose, she began naturally to feel uneasy about her interest. She remembered that she had nothing to lean upon in this regard but the honor of the congregation, and how far this would serve her under the changed circumstances, she seems to have doubted. She

therefore again, acting through Dr. Carriere, addressed to them a letter asking them to give her a writtten obligation to pay the interest on the money which she had given them. This letter was presented to the congregation by Dr. Carriere. It created an uproar, and, in the expressive language of one of the members, it went into the waste-basket. They denied any obligation to pay her interest, and claimed that the $70 which they had paid her was a gift; and they now assert, as a part of their defence in this case, that they stand under no obligation to pay her interest. This demand was not complied with. The members of the congregation simply gave her to understand that they were honest people and she could trust to their honor. But, nevertheless, the interest did not come, nor did any donation come; and, on the 9th of July, 1879, she wrote another letter to the president of the congregation, reminding him that the congregation had drawn the first dividend upon the note she had given them, and requested them to hand over the interest due her. This seems to have produced no result, and in December, 1879, she wrote another letter, reminding the congregation that her gift was $4,000, not more, and requesting them, as honest people, to pay over the excess of this sum, which she was informed they had received. Again, on March 1, 1880, she writes a letter in the following language : —

"ST. LOUIS, March 1, 1880.

"*Dear Mr. Henry Klages:* —

"I feel compelled to request you to see to it that I am at least informed with certainty upon which days I may expect my interest from your congregation. Formerly, I received them on the 16th of February, and the 16th of August, therefore semi-annually, and I wish them so now, and want to know definitely from the congregation. I am tired of constantly begging for them, and as the entire congregation profess to be honest people, they can

well say to me I may expect my own, and can hand it to me without my having first to demand it each time.

"Respectfully,

"ELIZABETH CASPARI."

These letters served to exasperate the members of the congregation. They professed themselves willing to give her donations, but not interest. Except the $70 already spoken of, they gave her neither. Finally, worn out with these entreaties, she consulted a lawyer. This was the first time in this period of three years, so far as the testimony shows, that she had had the benefit of competent and disinterested advice. She now discovered that this gift had been obtained from her through means which the law does not sanction, and that she could set it aside; and for that purpose this suit was instituted.

We may now revert briefly to the nature of the confidential relations which the pastor sustained to her. The plaintiff argues that they stood to each other in the three-fold relation of spiritual adviser and advisee, physician and patient, and confidential agent and principal. That he stood to her throughout these transactions in the first and last of these relations, is clear. The evidence also shows that he was a homœopathic physician, but I do not discover any evidence that she was his patient; at least she does not appear to have been under his treatment for any complaint at any of the times when the successive forms of gift were made to the church by her. We must, therefore, reject the existence of this relation. He nevertheless was, and had been for ten or twelve years, the pastor of her church and her spiritual adviser. During all this time he had lived but a few doors from her. Their families had always been intimate. After the death of Gustav Morgens he became her business adviser. In fact, the testimony shows that he had unbounded influence over her, — one of the witnesses for the defence stating that he could persuade her to do almost any-

thing.   Neither is there any doubt whatever, upon this evidence, that the deed of gift which is here sought to be set aside, as well as the forms of gift which preceded it, were all obtained through the active solicitation of the pastor.   It is clear of doubt that no gift would have been made by her, to take effect during her lifetime, but for these solicitations. There is the further fact that the gift, as made, was highly improvident.   The testimony tends to show that it left her in straitened circumstances.   It left her aged, feeble, and unable to earn anything for her own support, with the burden of supporting a dissipated step-son, and with no other income than that derived from the rental of some property which, when rented and the rent collected, yielded her a gross income of but $53 a month.   Deducting from this the taxes, the cost of repairs, insurance, water rates, losses from bad tenants, from times when the property is not rented, and it is obvious that this income is insufficient for the comfortable support of one in her condition of life, to say nothing of two.   It is equally clear, upon this testimony, that the substantial condition upon which this gift was made, namely, that she was to have the income which this amount of money would produce, was repudiated by the society.   She made the gift to the church, through the pastor, upon the terms that she should have the income which this money would produce, in the form of interest.   The church deny any obligation to pay her interest, but when appealed to by her in her extreme need, they offer her the humiliation of charity.

We think that few cases will be found in the books which afford stronger grounds for invoking the exercise of the jurisdiction of a court of equity to set aside gifts obtained by undue influence exerted upon persons by others who stand toward them in confidential relations.   We need not go outside the books of reports of our own state in order to learn what this jurisdiction is and how it is exercised.   The decisions of our supreme court fully support the grounds on which we are asked to exercise this jurisdiction in the pres-

ent case, namely, that if the relation of spiritual adviser
and advisee, pastor and member of his congregation, con-
fidential agent and principal, physician and patient, guardian
and ward, attorney and client, or any other confidential or
fiduciary relation be shown to exist between the donor and
donee, or between the donor and the person by whose
intervention the donee holds, a presumption, founded upon
public policy, arises that the bounty was obtained by fraud,
by undue influence, or by other improper means. Such
presumption arises from the mere relation of the parties,
and the burden is cast upon the donee, of showing by the
clearest evidence, that the gift was so far the offspring of
the donor's uninfluenced mind, that it would have been made
if he had not been subjected to the particular influence. Un-
less this is shown, even where fraud in fact is not made to ap-
pear, such gifts are generally set aside as fraudulent in law.
In all these cases, it is sufficient for the party attacking the gift
merely to show, in order to make out a *prima facie* case, that
the person through whose instrumentality the gift was ob-
tained, stood at the time in one of these confidential relations
toward the donor. It is scarcely necessary for the pur-
poses of this case, to notice the strong language in which
the supreme court of this state has, in numerous cases,
stated this doctrine. "There is no subject," says Wagner,
J., "in the whole range of equity jurisprudence, where its
salutary principles have been more often invoked than in
those cases where donations have been obtained by persons
standing in some confidential, fiduciary, or other relation
toward the donor, and where they may have exercised
dominion over him. Transactions of this kind, taking place
between attorney and client, spiritual adviser and advisee,
trustee and *cestui que trust*, parent and child, and guardian
and ward, are watched by courts with the most scrutinizing
jealousy, and generally held to be presumptively void."
*Garvin* v. *Williams*, 44 Mo. 465, 469; *s. c.* 50 Mo. 206.
This salutary doctrine has been reiterated, in various forms

of expression, and acted upon in *Harvey* v. *Sullens* (46 Mo. 147), *Cadwallader* v. *West* (48 Mo. 483), *Yosti* v. *Laughran* (49 Mo. 594), *Street* v. *Goss* (62 Mo. 226), *Ranken* v. *Patton* (65 Mo. 378, 411), *Bradshaw* v. *Yates* (67 Mo. 221, 228), and *Ford* v. *Hennessey* (70 Mo. 580). " Such donations," says Bliss, J., " will not only be watched with great jealousy, but will be set aside upon the discovery of the least fraud. Every presumption is against them." *Yosti* v. *Laughran*, 49 Mo. 594, 598. " The rule on this point," says Sherwood, J., " is of universal recognition, and finds application commensurate with the existence of confidential relations. * * * There exists, therefore, no necessity to show fraud or imposition practised on him who bestows the confidence ; but simply to show that, during the pendency of such intimate relations, the conveyance in question was made. This being done, all the above-mentioned consequences as to the *onus* of proof attend the given transaction as inevitable incidents." *Street* v. *Goss*, 62 Mo. 226, 228. So held in *Bradshaw* v. *Yates*, 67 Mo. 221, 228.

There is another branch of this doctrine upon which alone, if there were no other grounds, we should be required to decide this case for the plaintiff; and this is found in the expression of the rule by Norton, J., in *Ranken* v. *Patton* (65 Mo. 378, 410), quoted with approval in *Bradshaw* v. *Yates* (67 Mo. 228), namely : " Where a confidential relation exists, and the subordinate conveys to the superior, courts of equity * * * require the act to be done with a reasonable knowledge of all the facts necessary to an understanding of what the grantor is doing." And they not only require the act to be so done, but they make it incumbent upon the person through whose instrumentality the doing of the act is procured, to say that it is so done. In other words, as stated by Mr. Justice Story, " it is incumbent upon persons who receive benefits from those towards whom they stand in confidential relations, to show that such persons had competent and independent

advice." 1 Story's Eq. Jur., sect. 312. This principle was declared and acted upon by our supreme court in the latest reported case upon this subject, and it was there held, that the fact that the person through whose instrumentality the gift is obtained does not derive any personal benefit from the gift, does not take the case out of this rule. It is equally incumbent upon him to see that the donor does not act upon his advice alone, but that he has other competent advice from disinterested persons. *Ford v. Hennessey*, 70 Mo. 580, 590. In this case, these donees have not only failed to show that at the times when Mrs. Caspari took the various steps in this donation, — gave them her own $3,000 note, then turned over to them the $4,000 note of Morgens, then executed a deed of gift to them of this latter note, — she had competent and disinterested advice ; but, on the contrary, all the testimony shows that, during this long period she had no such advice, nor any communication with any one upon the subject, except the pastor and other influential members of the church, all of whom were interested in obtaining the gift for the church. So far from procuring for her such advice, the testimony shows, on the part of the pastor, a studied attempt and the greatest pains to conceal from the step-children of Mrs. Caspari, from her neighbors, and even from the members of the congregation, except two or three who were taken into the secret, the fact of the making of this gift, and it was not made known to the congregation until after it had assumed the solemn form of a deed of gift, duly acknowledged and recorded. The efforts made to this end, — secret meetings in the pastor's house at night, the drafting of the papers in the handwriting of the pastor's wife, the keeping of the congregation in ignorance with regard to the matter, the strong impression which Mrs. Caspari's mind had evidently acquired from those advising her of the necessity of keeping it secret, — all these things disclose a sedulous purpose to prevent her from having the benefit of

competent and disinterested advice with reference to a transaction so obviously prejudicial to her interests. The only appearance furnished by the evidence of her having had such advice, is found in the testimony of William B. Morgens, to the effect that, when he discovered that she had given the note to the church he took pains to ascertain whether it had been voluntarily done by her. But this was after the gift of the note had been made, and when a feeling of pride would have prevented her from admitting that she had not given it voluntarily. Moreover, he was interested with the other members in the church having this money. It is true he was opposed to purchasing the Webster Street building which was purchased, but he was not opposed to the purchase of a new church edifice; he wanted one in a more central location.

It seems scarcely necessary to say more, unless to notice some of the points urged in favor of this gift by the defendants. First, it is urged that the gift was the result of an intention long harbored by Mrs. Caspari, and in no wise created by the pastor. This cannot be said of the gift *as made*. Mrs. Caspari had long intended to make a gift to the church, but not this gift. She had intended to give the church something after her death, not during her lifetime. She had not intended to part with the income of any of her estate, which she needed for her support and that of her eldest step son. And, finally, she did not intend to give $4,000, but only $3,000. It is perfectly clear upon the testimony that, but for the active influence and solicitations of the pastor, the most that the church would ever have received from her would have been a bequest in her will of $3,000.

Again, the learned counsel for the defendants assert that the gift was Mrs. Caspari's voluntary and deliberate act. That it was her voluntary act is true, and this is true in nearly every case of this kind. It was not obtained under

duress of any kind. That it was her deliberate act is also true. She undoubtedly deliberated upon the subject. She thought upon it in the sense of thinking it over, and she no doubt thought upon it a good deal. But what does this avail the defendants in the face of the additional fact that the conclusion of these deliberations was shaped by the active intervention of her pastor and business adviser, and that her mind was finally brought to the point of consent by the making of a promise to her which the donees have not kept. How she deliberated is painfully disclosed throughout this long record. She deliberated without the mind to deliberate properly. She deliberated under the influence of her pastor, her business adviser, and her fast friend. To express it as she has expressed it in her own broken English: " He coaxed me that I shall do it. * * * He is the man that has done what is done." " I trusted in him that he knew and will do what is right for me." " I had nobody to do what I can't do." " I have been so trusting, because we know each other in the congregation for so many years." " I could not afford to get anybody to attend to business. I told him to do what was right for me, because I am an old woman and have no husband, and nobody had a better friend and neighbor than he was, and a good minister." She could not even read the English language, in which the deed of gift was written ; she evidently did not understand its purport, except that she was giving the $4,000 note to the church, in some way so that she would have the income during her life, and that the gift should be effective after her death. She says : " I never, so far as I know, promised my money to go out of my hands before I die. That is my principal. I saved it for my old age, and now I am old."

Again, the learned counsel state that, " to enable the congregation to buy the new church building, plaintiff did in advance what she had at all times intended to do at her

death. She made the gift to take effect immediately, instead of postponing it to the time of her death.'' We do not think the testimony bears out this position. The testimony of Dr. Carriere is distinct upon the point that the $4,000 note had been turned over to the church two months before it was known that the Webster Street building was for sale, and two months before the project of buying this church was actively considered by the congregation. This will also dispose of the position that the plaintiff induced the church to consummate the purchase of this edifice by this gift. The gift was not made on consideration of their buying the church, though we have no doubt it was made with the view of enabling them to buy at sometime, an edifice more commodious than the one in which they were worshipping.

Counsel also appeal to Mrs. Caspari's acts in recognition and ratification of this deed. An answer to this is, that all these acts, such as they were, took place before she had consulted with counsel, and while she remained under the same influence as the influence which had prompted her to make the gift. There is no evidence whatever, that at the time of any of the attempts made by her, which are appealed to as ratifications of the gift, she had the benefit of any competent or disinterested advice upon the subject.

Finally, it is urged on the part of the defendants that the dissensions in the church furnished the motive for the bringing of this suit. That these dissensions were the occasion of this suit, we do not doubt; that, but for these dissensions, in which Mrs. Caspari felt bound to side with the pastor and against the majority of the congregation, her interest would have been paid, that she would have continued to worship with them in the church edifice bought in part with this gift, under the ministrations of her former pastor; and that, under these circumstances, she would not have desired to revoke the gift, although her legal right

to do so would have been just as clear as though no dissension had taken place.    Upon this point, the language of the learned judge who heard this case in the circuit court (Adams, J.), is very judicious.    He states, in a memorandum of opinion filed by him, that his first impression was that this church quarrel took away the plaintiff's equity ; but he says :  " Upon more reflection I am of the opinion that the plaintiff's equitable rights are not affected by this matter.    On the contrary, it affords a striking illustration of the wisdom of the equitable doctrine underlying this case. The gift contemplated by plaintiff as a legacy upon her death, was subject to her own control, and necessarily would remain so until her death.    If she had executed a will, she could have revoked it at her pleasure during life, in the event that circumstances required it ; and the very troubles which followed the gift in this case were such circumstances as would undoubtedly have prompted her to do so.    If she had been allowed to make her donation, as originally intended by her, probably the quarrel would not have occurred, at least not till after her death ; at any rate, she would not now be placed in the embarrassing position she occupies.    The above comments show how different in its effects the gift contemplated by her would have been from those that flow from the gift as made."

The case was determined in the circuit court in accordance with the views here expressed.    A decree was entered declaring the deed of gift null, ordering that it be cancelled, and adjudging the defendants to pay to the plaintiff the sum of $3,819.57, the amount which they had collected upon the note, with interest from the filing of the petition.    This decree is affirmed.    Judge Bakewell concurs ; Judge Lewis did not sit.