# Killen's Estate.

*Lunacy—Insanity—Hallucinations—Faith cure—Judgment notes.*

Where an aged woman who had attempted suicide, and who had fallen into a condition of nervous prostration, associates herself with a sect of faith curists, and while under their influence and subject to hallucinations as to herself and her children, executes to a representative of the sect promissory notes for large sums of money, and subsequently dies, such notes cannot be enforced as a valid claim against her estate.

Argued Oct. 27, 1908.   Appeal, No. 42, Oct. T., 1908, by the Gospel Trumpet Publishing Company, from decree of O. C. Allegheny Co., Jan. T., 1907, No. 100, dismissing excep-

tions to adjudication in Estate of Sarah E. Killen. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Exceptions to adjudication.

MILLER, J., filed the following opinion:

The question is, whether Sarah E. Killen, now deceased, was insane or unduly influenced when, without valuable consideration, she executed and delivered to the Gospel Trumpet Publishing Company two judgment notes, aggregating $4,300, for which claim is made, with interest thereon from January 5, 1903.

### THE FACTS.

The decedent, prior to 1898, was a widow having three daughters, one of whom had died leaving a young son, who with his father lived in Mrs. Killen's family; the other two daughters were then minors, and the youngest is now seventeen years of age.

During this period her health became impaired; her trouble is described as nervous prostration. She became depressed, and in this condition attempted to end her life by taking poison. By medical treatment her life was saved, and on December 24, 1898, she was sent to St. Francis Hospital, in this city, where she remained until August 2, 1899. Connected with this institution is a department that makes a specialty of treatment of persons who suffer from mental disorders.

Following her return to her home, her nervous condition did not improve; twice she wandered from the house in her underclothes, and was found at midnight at or near a high embankment of a stone quarry. She also refused to take food in sufficient quantities for nourishment, and with a knife cut several gashes into her leg.

Her condition not improving she was, on August 18, 1899, taken to the Mercy Hospital, in this city, for treatment. On October 6, 1899, she was brought home.

In the meanwhile she began to take great interest in a religious organization, one of whose chief tenets is the curing

of diseases by faith, prayer and other religious rites; after her return from the Mercy Hospital, into the summer or fall of 1902, her interest and devotion to this form of religious teaching engrossed almost her entire attention.

In the borough of Wilkinsburg, near her home which was in Braddock, there was an organization of the followers of this faith, who held their religious services in their respective private houses; she became very intimate with these adherents; she procured and read many of the books and pamphlets, which the organization under the name of the Gospel Trumpet Publishing Company had for distribution and sale; she became an agent for the distribution of some of these publications, and posted bible texts as found in these writings, not only in, but on the outside of her dwelling house.

When at home she spent much of her time in bed, but refused to send for a physician, asserting that medicines were of the devil. So fixed was her opposition to medical help that she destroyed the medicines prescribed for her sick grandchild while suffering from a serious illness. Her belief was that prayers and faith alone would cure physical ills. Frequently she sent her young daughter, then but a child of twelve, and others, at midnight to the homes of the adherents or leaders of her newly adopted faith, with requests that they should visit her, which they did, prayed with and for her and anointed her head with oil. She asserted to her neighbor that the hard water with which clothes were being washed could be changed to soft water by her prayers.

She had no distinct physical ailment, and did not seem to suffer from any special pain or disease. She believed that she suffered from a cancer which her physician in 1898 declared was wholly imaginary. During this period she also showed other evidences of mental delusions; she stated to her brother that she imagined she had killed or was killing her children. She abandoned her church relations with the Methodist Episcopal Church of which she formerly had been a devoted adherent; she endeavored to persuade all with whom she came in contact to accept her new faith; she talked of little but the merits of this faith; and was depressed because her

daughters did not unite with her, and had no sympathy with her beliefs.

She became acquainted with the founders of this denomination, which had its then principal location under the name of the Gospel Trumpet Home at Moundsville, West Virginia, to which place she had taken several trips, and was there received for rest and the treatment outlined.

Down until 1902, her estate was very small; then her interest in her father's farm was sold for approximately $12,000, of which $10,000 remain. Immediately thereafter, upon the receipt of portion of the purchase money, she gave to Mr. Mc-Creery, one of the leaders of this new faith, $350, without any security; he is not financially responsible, and this money is lost. She also made donations amounting to several hundred dollars to the Gospel Trumpet Home at Moundsville, West Virginia. She stated to Mrs. Foreman that she did not appreciate money, and did not know how to care for it.

During November and December of 1902, she made many visits to the homes of the faith curists in Wilkinsburg, especially to the house of Mr. B. F. Carey, where many of the meetings were held. At this time she seems to have to a large extent separated herself from her daughters, who remained in the home at Braddock, and on or shortly after December 25, she again went to the house of Mr. Carey; there she took her bed; her oldest daughter visited her once, the youngest remained with her a few days. There her religious associates administered to her according to the tenets of their belief.

On January 3, 1903, Miss Phillips, who was also an inmate or visitor at the Carey home, by long distance telephone, asked Mr. E. E. Byrum, president of the Gospel Trumpet Company, at Moundsville, West Virginia, to come to Wilkinsburg, ostensibly to see Mrs. Killen; he arrived the same evening, and visited Mrs. Killen, where during that evening and also on Sunday religious services were held, rites administered and prayers offered for her. On Monday morning, January 5, Mrs. Killen directed Miss Phillips to prepare, and she executed, the two judgment notes upon which this claim is made, each being dated January 5, 1903, the one for $1,800, and the other

for $2,500, payable to the Gospel Trumpet Publishing Company in two years and eighteen months, respectively, with interest.

Miss Phillips at the same time prepared, and Mrs. Killen executed, a paper setting forth that she had on that day donated of her own free will to the Gospel Trumpet Publishing Company of Moundsville, West Virginia, the sum of $4,300, describing the notes already mentioned. This statement ends with the expression "the same is given as a free will offering to be used for the spread of the gospel and general salvation work."

At the same time she executed her will, wherein after bequeathing $300 to her little grandson, she divided the rest between her two daughters Clara B. Killen, and Nora E. Killen, with the proviso that "if either of my daughters die leaving no heirs the remainder of my estate to go to the Gospel Trumpet Publishing Company of Moundsville, West Virginia, to be used in the work of the gospel and general salvation work, to be used as they see fit." The notes, letter, and will were witnessed by B. F. Carey. The notes were given to Mr. Byrum, who at once returned to Moundsville. The will and letter remained in possession of Miss Phillips.

On January 17 or 18, 1903, Mrs. Killen returned to her home and remained until January 21, where at her request she was carried and helped to the station and left in company with Miss Phillips, who had accompanied her from the Carey home, to Moundsville, West Virginia, for further treatment. On February 11, 1903, her family were informed by Mr. Drew, a member and preacher of this organization, that he had brought their mother, and that she was lying on a cot in the railroad station; he at once returned to Moundsville. The family obtained help and conveyed the mother home. She was very much depressed, talked peculiarly; stated to her daughter that the people of Moundsville had told her that she would not be saved, that she was going to hell; but that she did not believe it.

Within a short time after this conversation, Mrs. Killen with a revolver, whose previous whereabouts has not been explained, put a bullet through her heart, and died the next day.

Her general appearance is described by the witnesses who saw her, as being that of one who was very nervous and depressed; she had a wild look. These witnesses, who are the members of her family, her brother and her neighbors, state that she was insane.

On the other hand, the members of this religious organization, who became her intimates and associates during the last two years of her life, assert that in their judgment she was rational, but suffered from nervous prostration, and seemed to be ill.

Dr. T. M. T. McKennan, an eminent specialist in nervous diseases, called by the claimant, stated that attempts at suicide raise a suspicion of insanity, and that the facts in this case as recited by the court warrant the same answer.

After her death, the father of her grandson, who had been left $300, instituted proceedings to contest her will on the ground of insanity and undue influence, making the other two daughters respondents. An issue was awarded by the register and sent to the common pleas for trial; by agreement between the father as guardian for his son, and the daughters through their representatives, the grandchild's share was increased, whereupon by consent a verdict was taken sustaining the will.

### THE LAW.

The evidence discloses all the religious elements, and is very similar to that found in Taylor v. Trich, 165 Pa. 586, where but for some minor errors, the Supreme Court clearly affirmed the finding that complete testamentary capacity was lacking.

Mrs. Killen's change of beliefs, her devotion to the new faith to the exclusion of everything else, unsettled her judgment and left her under the influence of a delusion, which usurped the place of reason. If there were nothing more in the case, it is clear that at this point she was partially insane. While prayer for and anointment of the sick is one of the most sacred injunctions and is immemorially recognized, the whole absorption of Mrs. Killen's life in this new teaching weakened her contractual powers.

While it may be conceded (Buchanan v. Pierie, 205 Pa. 123) that mere belief in spiritualism, faith cure or divine healing,

is not of itself evidence of mental unsoundness, yet the evidence here demonstrates that the notes in question were the direct offspring of that belief, and that under the circumstances of their execution, they were the result of a delusion. The conditions controlling her unduly influenced her in the absence of relatives and impartial advisers to divert her estate from her children.

But there is more than that; the attempts at suicide, themselves evidences of mental derangement, the progressive character of her mental illness, her hallucinations with respect to her children, her depression, her neglect of her family, her belief in imaginary diseases, her thoughts and conversations but upon one subject, viz.: divine healing, her failure to consult her brother about these dispositions, who had been her business adviser, and her absorption in the life of this new religious order, showed an increasing chronic condition of general insanity, which alone must avoid the enforcement of these obligations. The weight of the evidence confirms this conclusion with irresistible force and makes further elaboration unnecessary.

It is earnestly contended that the verdict in the common pleas is a finding that Mrs. Killen was sane when she made her will, and that this finding must be applied to her mental condition at the time of the execution of these notes. There might be force in this proposition if after testimony taken a jury had so found; but the evidence here is that to avoid a family conflict between the nephew and his aunts, being the grandchild and children of the decedent, an amicable settlement was reached between the parties; therefore a pro forma verdict in favor of the will had to be taken.

We must pass upon this case as presented upon the evidence before us, and we think we are justified in going behind the verdict as rendered in the common pleas and stating the facts upon which this verdict was rendered; if this be correct, then that verdict is conclusive of nothing so far as an adjudication upon Mrs. Killen's contractual capacity is concerned at the time of the execution of these notes.

The claims must therefore be dismissed.

*Error assigned* was the decree of the court.

*R. T. M. McCready*, for appellant.

*William Yost*, for appellee.

PER CURIAM, January 4, 1909:

The decree is affirmed on the statement of facts and opinion of the learned judge below.