HUBERT WEST et al., Appellees, v. IOWA SEVENTH DAY ADVENTIST ASSOCIATION, Appellant.

**DEEDS:** Validity—Mental Competency and Undue Influence. Evidence held insufficient to establish the mental incompetency of a grantor at the time of the execution of a deed.

**WITNESSES:** Competency—Transaction With Deceased Grantor. Neither the officers of an incorporated religious association nor the official ministers thereof are incompetent to testify to personal transactions and communications had with a deceased grantor to the association.

*Appeal from Floyd District Court.*—M. F. EDWARDS, Judge.

SEPTEMBER 23, 1922.

SUIT in equity, to set aside certain deeds executed by Amanda Smith to the Iowa Seventh Day Adventist Association, Incorporated. Facts appear in the opinion. The lower court entered a decree setting aside the deeds, from which decree defendant appeals.—*Reversed.*

*Bert B. Welty,* for appellant.

*H. J. Fitzgerald,* for appellees.

ARTHUR, J.—I.   On March 1, 1918, Amanda Smith executed, as a gift to the Iowa Seventh Day Adventist Association, Incorporated, deeds to two pieces of property located in Charles

City, Iowa. On June 27, 1919, Amanda Smith

1. DEEDS: validity: mental competency and undue influence.

died intestate, at the age of 70 years.   She was a widow, and left surviving her, as her only heirs at law, plaintiffs in this action, Hubert West and Leora Warner.   The property conveyed to the association was worth approximately $2,500.   She had other real estate, money, and other personal property, which she did not convey, worth about $3,000.

This action was brought to set aside the deeds to the association, and for a decree establishing ownership by inheritance in plaintiffs.

From her childhood until within a few years of her death, Amanda Smith had been a member of the Methodist Church. During the last five or six years of her life, she was a member of the Seventh Day Adventist Church.   Plaintiffs claim that Amanda Smith had become, at the time of the execution of the deeds in question, entirely under the influence of defendant, and particularly of the officers of the Iowa conference of defendant association and the local minister of the church, and was governed entirely by said minister and officers; that said minister and officers unduly influenced Amanda Smith to deed the two pieces of property to said association; that, at the time of the execution of the deeds, Amanda Smith had not mental capacity to understand or comprehend the nature and consequence of the execution of said deeds; that, at and prior to said time, she was in such a weakened mental condition that she became insane on religion, and especially the religion preached and practiced by the defendant association; and that her weakened mind was overcome and influenced by the officers of defendant association and its ministers to such an extent that she was induced to execute the deeds in question; that the deeds were without consideration, and were for the financial use of said association, and were procured by undue influence by the officers and ministers of said association.

The defendant answered, averring that, at the time Amanda Smith executed the deeds in question, she was a person of sound mind, and comprehended and understood the nature of her act; and defendant specifically denied that she was unduly influenced to execute the deeds.

Upon the issues thus joined, the cause was tried. The court made findings of fact and conclusions of law in substance as follows:

That there existed between Amanda Smith and her pastor, Rev. F. W. Meyers, of the Seventh Day Adventist Church at Charles City, Iowa, at and prior to the execution of the deeds in question, the relation of parishioner and pastor, and that there also existed between Amanda Smith and Rev. A. R. Ogden, the president of the defendant corporation, at said time, and Meta Meyers, wife of said Rev. W. F. Meyers, the relation of spiritual advisers to said Amanda Smith; that, because of said relations and the peculiar religious notion of Amanda Smith in relation to what she deemed her religious duty, as being commanded by the Lord to convey said real estate, and why she must do so, said parties, or some of them, obtained and held influence over said Amanda Smith, at and prior to the time in question, whereby she was deprived of or did not possess the power to exercise a deliberate judgment in the matter; that, by virtue of such relations, the pastor and officers of said defendant church organization, or some of them, acquired influence over said Amanda Smith. The court held, as a matter of law, that, in the transactions under investigation, there was an undue exercise of such influence. The court decreed the deeds to be void, and set them aside, and quieted title to the property in plaintiffs, from which decree defendant appeals.

Involved in the case are the questions of the mental capacity of Amanda Smith to make the deeds, and whether she was unduly influenced by the defendant, through its officers and ministers, to execute the deeds.

The record in this case is very voluminous. It would be impracticable to attempt to state the facts in detail, and it is not necessary to a decision of this case to do so.

II. Amanda Smith had been a member of the Methodist church from childhood up to within five or six years of her

death, when she espoused the religion of the defendant associa-
tion. Like most persons who change their religious faith, she
became very intense in her devotion to her new affiliation. She
had been married twice, and divorced from both husbands.
While living with her first husband, she was a member of the
Methodist church. The evidence is not clear whether he was
a member of the church or not, but he was inclined to that faith.
Her second husband was a Methodist, and they were living
together when she joined the Adventist church; and this had
something to do with their disagreement. He did not go with
her into the Adventist church. Her children, the plaintiffs
herein, are children of her first marriage. There were no chil-
dren by the second marriage. There is considerable testimony
concerning how she and her children got along. Some testimony
tends to show that they were not entirely agreeable with each
other, and that the children practically abandoned her in the
last days of her life. Other testimony is to the effect that there
never was any serious difficulty between them. From an ex-
amination of the record, we conclude that the filial affection be-
tween the children and their mother was of good quality; that
the children loved and revered their mother; and that her
affection for them is not subject to criticism. Amanda Smith
was rather stubborn, was not very agreeable, and was quite
determined in her ways. It is likely that the trouble between
her and both of her husbands was largely occasioned by her
rather intolerant disposition and unwillingness to concede very
much. She was an industrious woman, a good housekeeper,
clean and neat in every way, a good cook, and spread a good
table. After she embraced the Adventist religion, she refrained
from eating meat, and would not place it on her table for other
folks to eat, but provided her table with plenty of other food.
Likewise, after she espoused the Adventist faith, she kept Satur-
day, which she believed to be the Sabbath day of the Bible.
Also, after she joined the Adventist church, she did not rever-
ence Christmas, because, as she claimed, Christ was not born
in December, but was born along in June or July, basing such
belief on the fact that the shepherds were tending their sheep
at the time, and that that greatest of all events since creation
must have occurred in the summer time, and not in the winter.

She was controversial with her neighbors concerning the correct Sabbath day. She argued with them that Saturday was, in fact, the Sabbath day, instead of Sunday, as generally observed. She laid great stress upon her belief about this matter. She was very explicit, and laid great stress upon the tenets of faith of her church, and believed that the devotees of other churches were in error in their belief wherein they differed from hers, and intimated that they would suffer on that account in the future. Witnesses testified, in various forms, but substantially to the same effect, that Amanda Smith, in her later years, talked incessantly about her religion, and would scarcely engage in conversation on any other topic, and that she expressed very peculiar thoughts, such as that the Lord commanded her to do things; that she had received her command from God to give the property in question to the church; and that it was not a question of right or wrong, but that she had to do it, in order to obey the command of God, and be saved. It was on these expressions of Amanda Smith's that most of the witnesses based their judgment that she was insane or unsound of mind on religion. Mrs. Smith believed in the tithe system, and gave one tenth of her income to the church. Some witnesses criticized her conduct in that respect, and said that it was evidence of unsoundness. But it must be said to the credit of appellees that they do not criticize their mother on that score. Tithing is an approved method of church support by many people.

The soundness of Amanda Smith's mind is not seriously challenged, upon any other subject than religion. Some witnesses detail some small financial transactions with her, wherein they think that her actions indicated unsoundness of mind. She was in error in the financial disputes, and did and said untoward things, and displayed ill temper, but not unsoundness of mind. She had always been a good business woman, and frugal and economical. She conserved her property well. There is no challenge of her business capacity, except the transaction in question, and that is ascribed to religious fanaticism and unsoundness of mind therefrom resulting. There is in the record a volume of opinion testimony, offered to prove that Amanda Smith was insane on the subject of the Seventh Day Adventist religion. But we are bound to say that the law pronounces no

one insane or unsound of mind on account of mere religious belief, no matter how unreasonable .it may appear to a judge or to anyone else. A belief in the doctrines maintained by any of the religious denominations would not establish insanity or unsoundness of mind. Still, a person might be a monomaniac as to any form of religion, and so as to the Seventh Day Adventist religion. But we are not prepared to say that she was a monomaniac as to her religion. She was greatly wrapped up and absorbed and an unceasing worker in her church, and implicitly believed in the efficacy of prayer, and that her prayers were answered; and probably, when she spoke of being commanded by God to do certain things, she meant that her prayers were answered. We can hardly reason that she was insane on that account. Many people so believe. People whose sanity is not questioned claim to converse with people of the spirit world. It is not for us to pronounce judicially whether they do or not. There is nothing to impeach the soundness of Amanda Smith's mind in any business way, on account of inefficiency in business dealing, at the time the deeds in question were executed; and we are not prepared to say that she was insane or of unsound mind, on account of any peculiar religious beliefs. In the fall or winter following the making of the deeds, Amanda Smith was ill with the disease commonly known as "flu," which greatly impaired her health and strength, and she seems to have quite rapidly declined, from that time on.

To accord with the record, it must be said that Amanda Smith did not keep secret her intention to give a portion of her property to the church. She told neighbors that she was going to give these two properties to the church. She told her daughter, Leora Warner, that she intended to give some property to the church. Nor did she keep secret that she had given this property to the church. She told her neighbors quite generally, whenever she met them, that she had done so. It is true that her son and her daughter did not know that she had given the property to the church until after the transaction. Her son and daughter did not know of the execution of the deeds at the time of their execution. No one besides Ogden and Rev. Meyers and his wife and Amanda Smith were present when arrangement was made for conveyance of the property, and only Meyers and

his wife and the notary public who took acknowledgment of the deeds were present when the deeds were executed.

III. We will now set forth with some particularity material portions of the testimony of F. W. Meyers, the local pastor at Charles City, and his wife, who was a missionary in the church, and A. R. Ogden, president of the defendant association, who were present at the home of Amanda Smith when arrangements were made for conveyance of the property to defendant association by Amanda Smith; and also the testimony pertaining to the execution of the deeds in question later. We set out this testimony quite fully, because we are disposed to hold contrary to the decision of the learned court below.

Rev. F. W. Meyers testified that he was the local minister for the Adventists at Charles City during 1917 and 1918 and up to May 1, 1919; that he had known Amanda Smith for five years; that she was a member of his church in Charles City; that she had previously been an isolated member of the Iowa conference of the church, which had its headquarters at Nevada, Iowa; that he saw and conversed with Amanda Smith, and called at her house frequently, and lived in her house for a while, in the fall of 1918, but was not living there when the deeds were made; that, six months before the deeds were made, she talked to him about giving the property to the church; that she said, in the summer of 1917, that she wanted to give these two properties to help carry on the work of the gospel of Jesus Christ; that he did not suggest that she do this; that he never influenced her in any way; that she frequently mentioned giving the property to the church; that she asked him "if the property on Sixteenth Avenue would help any in spreading the gospel of Christ in Charles City," and he told her it would; that this talk was about two or three weeks before she made the deeds; that she asked him to send for Mr. Ogden, saying that she wanted to give the property to the church; that she had been thinking about it for a long time, and had made up her mind to do it; that he then called Mr. Ogden, and about a week later, Ogden came to Charles City; that he went with Ogden to Mrs. Smith's home, and upon their arrival, Mrs. Smith said to them that she had some property to give to the Iowa conference of Seventh Day Adventists; that they were at Mrs. Smith's house

about one hour; that Mrs. Smith said to them that it was her will and wish to give this property to the church, as she wanted it so that, "if anything happened to her, the property would be in the hands of the Lord;" that she handed Ogden two deeds that she had received for the property; that the talk with Mrs. Smith was that the property on Sixteenth Avenue was to be used for a church, and the one on Iowa Street for general missions, to be used for a school; that she would retain possession of the properties and collect the rents; that she was to retain control and income from the property until the association could use it in its work; that there was some talk that Mrs. Smith was to have the use of the property while she lived; that the Sixteenth Avenue property was either to be converted into a church or sold, and the proceeds used to build a church; that Ogden told Mrs. Smith that the property on Sixteenth Avenue was not well located for a church, and it might be better to use the proceeds to build a church on a more suitable place, and she agreed with him about that; that his wife was present at the conversation; that the property on Iowa Street was not to be taken by the conference until after she died, and the deeds were then to be recorded; that Mrs. Smith thought that it would be nice to have a church building on her lot; that this talk took place about two weeks before the first of March, 1918; that no deeds were prepared that day; that Mr. Ogden told Mrs. Smith that he would have the secretary prepare the deeds; that Ogden took the old deeds with him; that Mrs. Smith was to have the income from the property on Iowa Street as long as she lived, and when the church people were ready to build, they were to take and use or sell the property on Sixteenth Avenue; that he saw the deeds in question to the association first when Mrs. Smith executed them; that he saw Mrs. Smith sign and acknowledge them at the Security Bank, before Mr. Blunt, notary public; that Mrs. Smith said "Yes," she acknowledged them as her voluntary act and deed; that, after the deeds were executed, they were placed in an envelope and mailed to the association at Nevada, Iowa; that he never told Mrs. Smith that it was necessary for her to give the property to the church in order to save her soul, or anything of that kind; that, the first time he saw the deeds after they were executed, Mrs. Smith brought

them with her to Lindamen's chapel, where he was holding meetings, and showed them to him, and asked him to go to the bank with her, where she was going to sign and acknowledge them; that his understanding was that she was making a gift of the property to the association; that he knew that Mrs. Smith had two children; that he knew nothing about the financial condition of her daughter, Leora Warner; that he did not ask her whether she had talked it over with her children, but that she told him that she had mentioned it to her daughter before she made the deeds; that he did not exhort the people to give liberally of their property to the church, but that he told them "to do what the Bible says;" that he preached and read the Bible to the people, and told them that "they should give what they could towards the church;" that he did not tell them that "they would gain salvation better by giving their property;" that "we do not teach that you must be an Adventist to be saved. I think the Catholics and the others have an equal chance to get to heaven, if they do what the Bible teaches. We believe that God guides and teaches us through the Scriptures, through the words and messages of Christ."

Meyers testified, also, that Mrs. Smith never told him, after she made the deeds, that she wanted Ogden to come up and see her; that, if she had told him that she wanted to talk with Ogden, he would have asked him to come up, and would have advised that, if she wanted the property back, her request should be complied with; that his church has no book of discipline save the Bible; that his church teaches the Bible as a whole; that he did not receive any financial aid or salary of any kind from the defendant association; that it made no difference to him, financially or personally, whether the grantee in the deeds keeps the property or whether it is given to the heirs; that Mrs. Smith believed in Christ, and as the Bible teaches regarding his birth; that his people think that, according to the Scriptures, Christ was born in June or July, and base their belief on the twelfth chapter of Exodus, the first chapter of Luke, and the twenty-fourth chapter of Matthew, because, in those texts, it is said that, at the time of the birth of Christ, the shepherds were herding their flocks, which they did not do in wintertime; that he did not advise Mrs. Smith that it was

necessary for her, in order to get to heaven, to deed her property to the church; that she told him that it was her desire; that he told her that he could look after it for her, for he had nothing to do with the business of the association; that many Adventists eat meat, although the church advises against it; that Mrs. Smith told him that she was going to give her daughter her house, where she lived; that she said she did not want her son to have more than $5.00 of her property; that Mrs. Smith exercised control over the property while she lived; that the deeds were recorded after Mrs. Smith died.

A. R. Ogden testified that he was an Adventist minister, and, at the time of the transaction in question, was president of the defendant association, but was not, at the time of the trial, connected with the association; that he never requested Mrs. Smith to deed property to the church or to give anything to the church; that he did not know the nature of the business to be transacted, when he came to Charles City, in February, 1918, but merely understood that Mrs. Smith wanted to see him about some property; that Meyers told him that she wanted to see him about some property, but did not give him the particulars; that Mrs. Smith did not tell him that she had a command from God to convey the property to the church; that she told him that she was anxious that the work of the denomination be permanently established in Charles City; that his church did not teach that people receive special communications or commands from God in a general way; that they used the Bible for their instruction; that they taught that people in other denominations will be saved, the same as their people; that they kept Saturday as the Sabbath, and worked six days, according to the fourth commandment of the Decalogue; that they did that because they believed that the Bible teaches it; that Mrs. Smith paid tithes to the church.    —

Mrs. F. W. Meyers testified that she was a licensed missionary of the Seventh Day Adventist Conference; that she met Amanda Smith in 1913, and knew her continuously afterwards; that she was present and heard the conversation between Mrs. Smith and Rev. Ogden in February, 1918; that Mr. Ogden said to Mrs. Smith, "So you want to see me about disposing of some of your property," and Mrs. Smith said "Yes," that she had

wanted to see him for a long time, and said she wanted to
deed some property to the Iowa Seventh Day Adventist Asso-
ciation; that Mrs. Smith then went into the bedroom and got
a couple of old deeds and gave them to Ogden; that Mrs. Smith
told Ogden that she wanted the property on Iowa Street to be
used for general association and missionary work, and that she
wanted a local church erected on the property on Sixteenth
Avenue, but that, if the association felt that it had a more
suitable place, the property might be sold, and the money used
in the erection of a church at a more suitable place; that Ogden
and Mrs. Smith talked about 15 or 20 minutes, and that Ogden
was in the house about an hour; that Mrs. Smith prepared
luncheon for them; that she talked with Mrs. Smith frequently,
and that she never told her that she had received a command
from the Lord to give the property to the church, but did say
something about receiving an impression, and it may have been
a command, but she hardly thought that that was the word she
used; that she noticed, from the time the first meetings were
held in Charles City, that Mrs. Smith was very enthusiastic
about religion, and took great interest in the church and reli-
gious work; that she did not carry it to extremes, but was nor-
mal, as any Christian would be; that she and her husband knew,
long before the deeds were executed, that Mrs. Smith had signi-
fied her desire to give property to the church cause; that she
would not say that Mrs. Smith was insane because she had a
command from God, if she had one, because God sometimes uses
strange methods to convey his wishes; that God undoubtedly
impresses people as to their duties; that she never advised Mrs.
Smith to do anything with her property; that Mrs. Smith had
talked about giving her property to the church as long as she
was acquainted with her.

When Amanda Smith first entertained an intention to give
her property to the church, we do not know; and that is not
important. Important and perhaps pivotal questions are as to
how the intention was produced, and whether the transaction
of the execution of the deeds, entirely between the representa-
tives of the association on one side and Amanda Smith on the
other, without independent advice, and without the knowledge
of her children, should be upheld or not, under our finding that

Amanda Smith was not of unsound mind, and in the absence of direct testimony of undue influence. If her intention and purpose to make gift of her property to the defendant association arose naturally out of her conception of her duty to her God and her church, and if, afterwards, the execution of the deeds was of her own free will, uninfluenced by anyone, then the deeds are valid, and will not be disturbed.

Counsel for appellees takes the position, and argues with much force, and supports his position with authorities from eminent courts, that undue influence, as a matter of law, is presumed to have been exerted by the defendant association, through its representatives, because, when arrangement for the conveyances, and also when the execution of the deeds took place, no independent advice was accorded Amanda Smith, and neither were her children advised of the transaction. The position of appellees was sustained by the lower court. If such rule should be conceded to obtain in this jurisdiction, and the burden cast upon defendant association to overcome a presumption of undue influence, then we conclude, from a careful examination of the whole record, that the defendant association has met the burden that would be imposed upon it, and has overcome any such presumption by clear and satisfactory evidence.

Appellees interposed objection to the testimony of Ogden, president of the defendant association at the time of the transactions in question, and Meyers, minister of the church at Charles City, and Mrs. Meyers, a missionary of the church, on the ground that they were prohibited from testifying by Code Section 4604. These witnesses were not interested in the defendant corporation, as contemplated by said section, and the objections were not well taken.

2. WITNESSES: competency: transaction with deceased grantor.

A reading of the cases holding that a presumption of undue influence obtained because of confidential relations between the parties discloses that, in most instances, the donor was very old, or ill near unto death. Not so in the instant case. Amanda Smith was not an aged woman at the time of the transaction. She was about 70 years old. She was in fair health and physical strength. It was after the transaction that she was weakened physically by a siege of the "flu." Her business ability was

never challenged. She made no secret of her intention to give the property to the church. We think she was not of unsound mind. We are convinced and constrained to hold that the conveyances involved are valid.

The decree of the court below is reversed.—*Reversed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.