CARL NELSON *vs*. FRED E. DODGE *et al.*

JULY 29, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

2

CONDON, J. This is a bill in equity to declare the respondents trustees of certain real estate for the benefit of the complainant, and for other and further relief. After a hearing on bill, answer, replication and oral proof in the superior court a decree was entered denying the principle relief prayed for but awarding complainant damages in the sum of $10,468.82 and impressing a lien on part of the realty described in the bill to secure the payment of such sum. From the decree, the respondents have appealed to this court.

In support of their appeal the respondents have briefed and argued the following points: (1) By reason of bias and the predetermination of the cause by the trial justice they were denied an impartial trial; (2) the relief granted is beyond the scope of the bill; (3) complainant was guilty of laches; and (4) the trial justice erred in his rulings admitting and excluding evidence. Any reason of appeal not comprehended under those points is deemed to be waived because not briefed or argued. *Egan* v. *Walsh-Kaiser Co.,* 73 R. I. 399.

The fourth point though briefed and argued is not properly before us because there is no reason of appeal upon which it may be based. Respondents' statement of reasons of appeal originally contained among others the following: "That the trial judge erred in numerous rulings admitting or excluding evidence to the material damage of the respondents." On motion of the complainant, that reason was stricken from the statement by us because it did not separately and specifically identify each ruling. Under our appellate practice in equity reasons of appeal

which allege generally that the final decree is against the law and the evidence and the weight thereof are sufficient, *Egan* v. *Walsh-Kaiser Co., supra,* but to bring up for review alleged error in any special order or ruling made during the trial, separate reasons of appeal specifying each alleged erroneous action must appear in the reasons of appeal. *Vaill* v. *McPhail,* 34 R. I. 361.

Before discussing the first three points we shall outline briefly the facts out of which the present controversy arose. The property involved consists of two houses numbered 196 and 222 Crescent avenue, Cranston, hereinafter referred to as the little house and the big house respectively. We are concerned solely with the big house since the trial justice denied complainant relief as to the little house, and no appeal was claimed from such denial. Respondent Mabel C. Dodge, hereinafter called Mrs. Dodge, holds the legal title to the big house. She is the wife of respondent Fred E. Dodge, hereinafter called Mr. Dodge. They are the leaders of The Church of Jesus, Inc., a local religious sect in Cranston whose members worship in the big house and most of whom live there in a more or less communal way. Generally, they believe that God speaks directly to or through His children and that members of the church on occasion actually transmit His messages.

Mr. Dodge is the recognized minister of the church and Mrs. Dodge is the prophet. She is apparently highly regarded among the members as a very special message bearer and in that character compels implicit obedience. In our opinion she is the dominant personality in all of the sect's functions, spiritual and temporal. This is clear from the testimony of all the witnesses and especially from Mr. Dodge's own testimony concerning her. His estimate of her spiritual power and insight exceeded that of all the other witnesses. The record is replete with evidence that she rules the church almost absolutely, even to the point of hurling anathema and pronouncing excommunication. She claims, however, that when she drives persons from

the church it is not she but God, Who speaks through her. This assumed agency of the Deity gives her a dominance and pre-eminence in the church which is important to remember in any evaluation of the complainant's independence and free will after he came under her influence.

Complainant joined the church in 1926 when it held services in a hall at 7 Winter street, Providence. According to his own testimony, he became a firm believer in its doctrines and a faithful follower of its chief exponents, Mr. and Mrs. Dodge. In 1928 he married their daughter Evelyn by whom he has five children. She is supporting her husband's claim in this suit. Two years after their marriage they went to live in the same house with the Dodges and thereafter never lived apart from them until they were driven out of the big house by Mrs. Dodge. However, according to Mrs. Nelson, her husband did not want to make his home with the Dodges but felt that he had to do so when Mrs. Dodge said she had a message from God that they should all live together.

In 1936 the little house was purchased and they went to live there. When Mrs. Dodge first saw the house she announced that God said to take it. However, the house was for sale and not for rent and the Dodges had no money to purchase it, although Mr. Dodge had learned that it could be bought for a small cash payment of $100 and the balance on mortgage. Nevertheless Mrs. Dodge said that God wanted them to buy it. It developed that Nelson had money and he put up the $100 believing that he was going to have a share in the house, yet the title was placed in the names of Fred E. Dodge and Mabel C. Dodge as joint tenants. Notwithstanding these facts the trial justice denied complainant relief as to the little house. With such denial we are not concerned on this appeal but we mention the facts for two reasons: first, to show the influence of Mrs. Dodge in the family group and, second, to indicate how Nelson was discovered as the moneyman of the family.

This was no minor discovery in the little world of the Dodges as subsequent events proved.

In the latter part of 1937 Mrs. Dodge, according to the undisputed testimony, began to receive messages that God wanted a big house where all could live and worship together. She first persuaded Amos Bray, a member and minister of the church who had funds in the bank, that he should buy the land for the house. "Brother Bray," she said to him, "God has called me to build the house." Her announcement seems to have affected Bray "like a call from on high." He withdrew his money from the bank and bought three lots of land on Crescent avenue near the little house. Mr. Dodge, however, was not quite satisfied with this step and he refused to have anything to do with building the big house unless it was in one name. On the witness stand he said he did not trust men; that from experience he had learned they could not be trusted; and that he had no confidence in a group. It would seem that the name of Mabel C. Dodge was the one he desired on the deed, for on October 3, 1938 Bray transferred his title to her and thereafter he and Mrs. Bray moved into the little house and went on public relief. Neither Mr. Dodge nor Mrs. Dodge thought of having Bray transfer his title to the church although it was authorized to hold real estate to the value of $150,000 and although Mrs. Dodge's message was that God wanted the big house for His children and their children's children.

Sometime before this successful maneuver was executed the pressure was being placed on Nelson to surrender his savings also in the service of the cause. About the time Bray had bought or consented to buy the lots he asked Nelson to invest his money in the project for the big house, but Nelson declined saying that he already had his money well invested. Apparently in Mrs. Dodge's view this refusal was sinful or something of that nature. In any event she proceeded to draw on all her prophetic powers to show Nelson that God was angry.

Early in 1938 the education of Nelson began. At meetings in church and in the family group in the little house he was the target of repeated attacks by Mrs. Dodge in her role as prophet of the church receiving messages from God. These messages were substantially that Nelson was damned; that he was no good; that there was no hope for him; that he would burn in hell; that he would die unless he stripped himself; that God would not have him and that He would spew Nelson out of His mouth.

Those dire threats were sometimes accompanied by howling and angry cries from Mrs. Dodge who would throw herself on the floor simulating vomiting. Such displays of divine displeasure, for so the faithful, including Nelson, believed them to be, went on continually for several months. In the course of them, at church meetings he was sometimes pulled by the coat collar to the platform by Mr. Dodge or Mrs. Dodge and his head was placed under the piano. This treatment at length had the desired effect. Sick, nervous, depressed, and in a state bordering on utter physical exhaustion and religious despair he finally succumbed and asked Mrs. Dodge if there was any hope for him. Her answer was that God wanted him to strip himself and that if he did he could then get closer to God.

Completely broken in will and spirit, in fear of death, and in despair of salvation, Nelson began the process of stripping himself of all he possessed, savings accounts, stocks, investments, insurance on his own life and even his children's life insurance. As to the last item he pleaded that he might keep it, especially since the cash value of the policy amounted to only a few dollars, but he was told that God said he must strip himself of everything. Even after he started to turn over his money he was not given any peace as the Dodges thought he was holding back and not stripping himself fast enough. In August 1938 he turned over $1000; in September $3443.34; in October $200; in April 1939 $200; in May $859.58; in June $3847.33; and in November $214.09 and $30, the last being the cash value

of a child's insurance policy. In all, it was admitted that he had turned over $9876.25. Nelson testified that was all he possessed. These sums were deposited in the personal bank accounts of Mr. Dodge and Mrs. Dodge and were used to pay part of the cost of building the big house.

Respondents told Nelson that he and his family would have a home there for life. However, sometime in 1947 Mrs. Dodge began to get messages that Nelson was no good; that he was a thief and a robber; that he was a fraud and a sham; that he would have to go; and other members were told not to talk to him. She also had messages about a separation; that her daughter should separate from her husband, or at least the Nelsons so understood her, although she denied that was what was meant. This kind of treatment was kept up continually until Nelson was made so miserable he began to doubt the church, ceased to attend some meetings, and went to services in another church with his brother-in-law Carl J. Lawson. Shortly thereafter on Monday, June 9, 1947, at two o'clock in the morning members of the church led by Mrs. Dodge in effect drove Nelson and his family from the big house, and they were forced to take refuge with another family that had formerly been members of the church but had also been forced from the big house by Mrs. Dodge in a somewhat similar manner. Mrs. Dodge denied that she had put either Nelson's family or that family out of the house but that she had received a message from God that they had to go.

The members of the church believed implicitly in Mrs. Dodge's power to receive messages directly from God. Such belief was a part of the religion of this church and up to this time Nelson also was a firm believer, although he was beginning to doubt. He now consulted counsel. After the above incident he was no longer confident that the church or the Dodges were of God and he began to distrust them. He naturally wondered whether he had lost all his money and been left homeless in the bargain

Upon receiving for the first time independent advice and being now entirely free from the influence of the Dodges, and particularly Mrs. Dodge, he promptly brought the instant suit to compel restitution by the respondents in some way of the money which they had taken from him.

Some of the facts related above are only partly concurred in by Mr. and Mrs. Dodge and their witnesses; and other incidents are categorically denied by them. We have summarized those facts substantially as testified to by Mr. and Mrs. Nelson and their witnesses. A careful reading of the transcript has convinced us that their evidence is more credible than that of the respondents. Neither Mr. Dodge's nor Mrs. Dodge's testimony impressed us as veracious in significant particulars, not so much because it was directly false but because by its evasiveness it strongly appeared to suppress the truth. Perhaps, according to their lights, it was their religious duty not to testify about Mrs. Dodge's so-called messages from God because of their sacredness, as Mr. Dodge so stated in his cross-examination, but their testimony was thereby made to lack credibility in some instances vitally important to the issues in the case.

The evidentiary record of the trial was twelve days in the making. As the trial progressed the atmosphere of the courtroom became surcharged with religious feeling. Almost every adult member of the church testified on one side or the other. At times the intensity of the religious fervor of the respondents and some of their witnesses rose to such heights that their testimony was frequently unresponsive to the questions propounded by counsel and temporarily obscured the real issue on trial. That issue, as court and counsel observed during the trial, had nothing to do with the religious beliefs of the parties. The only issue on trial was whether, in inducing the complainant to divest himself of all his property on the pretext that if he did not his soul and even his life would be lost, the conduct of the Dodges amounted to undue influence which rendered the transfer of his money invalid.

This was no ordinary trial. Not once but many times it burst the bounds of decorum principally because of the demeanor of the respondents on the witness stand. Their witnesses very largely seem to have taken their cue from the respondents in the attempt to make the trial appear to be a trial of their religion. Even from the cold record we sense the unusual difficulties which beset the justice who presided over the trial. Yet respondents charge him with personal bias against them which they say he manifested on numerous occasions but especially on the third day of the trial while the complainant's side was still being presented and before a single witness for the respondents had been heard.

On that occasion the trial justice suggested to counsel the possibility of adjusting the controversy out of court. In the course of his suggestion he made observations about the case based upon the testimony he had already heard, but more especially on his understanding of the law applicable thereto, that led him to believe that it might be prudent as well as economical for both parties to reach a settlement. He did not say he believed the respondents had no case, although he intimated that he would not be impressed by designing persons who proclaimed themselves spokesmen of God. He said his mind was otherwise open and would continue so to the end of the trial. In our opinion this was no more than a suggestion by the trial justice to counsel for both sides to consider the advantages of a settlement. It was not evidence of bias against the respondents personally which he had formed before trial but was only a tentative opinion formed from the sworn testimony in the case up to that point. That opinion, however, was, he said, subject to change if contrary testimony showed that no undue influence had actually been exercised over the complainant.

We do not think that this incident is the kind of evidence upon which courts base disqualification of a judge because he is inherently biased against a party or has pre-

determined the cause before hearing. Certainly our cases which are cited by respondents do not support their contention. *Kelley* v. *City Council,* 61 R. I. 472; *Narragansett Racing Ass'n, Inc.* v. *Kiernan,* 59 R. I. 90; *Hanna* v. *Board of Aldermen,* 54 R. I. 392. In the *Narragansett Racing Ass'n* case and the *Hanna* case there was undisputed evidence of personal bias or predetermination of the case before any hearing. In the *Kelley* case no bias was found and the law of disqualification of a judge, in the absence of a statute, was stated as follows at page 482: "* * * the party urging disqualification must affirmatively establish that the judge has personal bias or prejudice against him by reason of preconceived or settled opinion, of a character calculated to seriously impair his impartiality and sway his judgment." Mere opinion in the matter which can be removed by evidence, it was further said in that case, does not disqualify.

We are of the opinion that in the case at bar the trial justice did not exhibit such personal bias in the incident relied upon nor did he evince partiality or prejudice in the numerous other instances which respondent enumerates in his brief. While in those instances he may have shown impatience at the conduct of respondents and some of their witnesses he did not close his mind against their side of the case before hearing their testimony. On the contrary the record shows that he allowed council for the respondents wide latitude in presenting their case over repeated objections of complainant's counsel, and such liberality extended even to tolerating conduct on the part of respondents, especially Mrs. Dodge, that at times bordered on contempt.

Unquestionably, he judicially weighed all the evidence before him which fairly related to the issue on trial, although on several occasions during the trial he may have viewed with great impatience the strange manifestations of the respondents' religious cult which took place before him. The proof that he was not biased against the respondents in weighing the evidence and considering the merits of

their defense lies in the fact that he found in their favor as to the little house and that he did not allow complainant interest for the full period that respondents had his money but only from his eviction from the big house on June 9, 1947, because he said that until that date complainant had enjoyed the benefits of living there. The trial justice thus limited the complainant's relief despite the fact that there was uncontradicted evidence that, like the others, he had actually paid for his family's accommodations in the house, and that he had also contributed uncompensated personal labor in the building of the house. On the whole, we think that respondents have no just cause of complaint against the trial justice on the score of bias and prejudice. All things considered, we are of the opinion that they had the benefit of a fair and impartial trial on the real issue involved.

The trial justice's decision itself accorded with the law and the facts. It is clear that a confidential relation comparable to that of clergyman and parishioner existed between respondents and complainant. Indeed as far as Mrs. Dodge is concerned this was true to an extreme degree. Complainant not only trusted her utterly but he also feared her. The source of that fear we need not explore, nor do we or should we wonder at the simplicity and unreserved completeness of complainant's trust. That both sprang from a deep and abiding religious faith on the part of the complainant is understandable. The law recognizes that such a complete surrender may exist and as long as it operates in the world of the spirit the law has no concern about it. There our writ does not run. But when such trust is betrayed and such fear is preyed upon in order to obtain another person's property even though not for one's self the processes of equity will come to the aid of the one who has parted with his property while under that influence. In *Corrigan* v. *Pironi*, 48 N. J. Eq. 607, 609, it is stated: "In the presence of such a spiritual ascendency, all gifts or benefactions from the subject of such an influence

to the possessor of it, have been frequently avoided on grounds of public policy, and without any suspicion that fraud or imposition of any kind had been practiced."

The donee in such a case has the burden to show perfect fairness toward, complete freedom of, and absence of influence upon, the donor. And it is not at all necessary for the donor to show that the benefit from the gift inured to the spiritual adviser personally to render it void. The wrong to the donor is in the influence exercised over him and not in the gift thereby obtained. *Ross* v. *Conway*, 92 Cal. 632. In the case of a spiritual adviser there is a presumption of undue influence, and the adviser has the burden to prove that the donor was entirely free from such influence. 17 C. J. S. Contracts, §184, p. 543. It is a difficult burden to discharge. *Johnson* v. *Johnson*, 196 Iowa 343. A gift to another is not easy to sustain where the influence of a spiritual adviser is involved. For applications of this principle to facts not unlike those in the case at bar see *Caspari* v. *First German Church of New Jerusalem*, 12 Mo. App. 293, affirmed 82 Mo. 649, and *Killen's Estate*, 223 Pa. 201.

The above-cited cases are significant examples of the well-settled rule that the utmost good faith must be shown by one in any confidential relation, even though not technically a fiduciary, in order to support a gift of money or anything of value obtained from another who has reposed the trust and confidence. In the case at bar the evidence indisputably establishes the confidential relation between complainant and the respondents, but respondents have failed utterly in establishing their good faith. On the ground of undue influence, therefore, the trial justice was fully justified in voiding the transaction between the parties.

Respondents nevertheless contend that by delaying for eight years before bringing his suit and by living in the big house and enjoying its benefits he has lost his right, through laches, to complain and has acquiesced in and ratified the alleged voidable transaction. We disagree.

14

The facts and circumstances in the record furnish no basis for any of those contentions. Nelson continued under the influence of Mr. and Mrs. Dodge throughout that period and did not have the benefit of independent advice. On the contrary he was kept continually conscious of the power of Mrs. Dodge or the power he believed she possessed. Her will was dominant; his will was not free. When at last it was free he sought and obtained independent advice and thereafter promptly acted to regain the money of which he had been constructively defrauded.

During that period of delay the respondents suffered no disadvantage which equity recognizes. The death of Amos Bray was not such a disadvantage. He died after this suit was brought but before trial. Respondents had the right to preserve his testimony by deposition in anticipation of trial but did not do so. Moreover, assuming such testimony would have been favorable to respondents it does not appear how it could have affected the result in their favor. The mere fact of death of a witness is not in and of itself such a disadvantage. *Caswell* v. *Bathrick,* 53 R. I. 114. Laches is not mere delay but delay that works a disadvantage to another. *Oldham* v. *Oldham,* 58 R. I. 268. It does not exist as a defense where the party charged with the delay has been without full knowledge of the fraud and has not enjoyed full freedom of action. *Stephens* v. *Dubois,* 31 R. I. 138. In that case the same rule was applied to the defense of acquiescence or ratification. Delay as a defense is not favored in equity where the defrauding party held a confidential or fiduciary relation to the party defrauded. *Shoup* v. *Dowsey,* 134 N. J. Eq. 440.

We have reserved for final consideration respondents' second contention that the relief granted is outside the scope of complainant's bill. It is true that the principal relief prayed for as to the big house was that the respondents be declared trustees thereof for the benefit of complainant and others who could show an interest therein. That relief was not granted but a money award secured by a

lien was granted as alternative relief. In our opinion such relief could properly be granted under the prayer for other and further relief. In *Morin* v. *Randall*, 60 R. I. 505, 509, the court stated: "Ordinarily, under such prayer a complainant should not be denied all relief merely because he has failed to sustain his prayer for specific relief, if, consistent with the general allegations of the bill, the proof sufficiently shows that he has established certain rights within the scope of his bill which equity should protect."

The rights of the complainant which are alleged in the instant bill and the wrongs alleged to have been committed against him pertain to sums of money obtained from him by the respondents. Such allegations have been fully proved. Proof has also been made that such money was expended in constructing the big house the title to which is in the name of the respondent Mabel C. Dodge who wrongfully, by the exercise of undue influence, obtained complainant's money to be so used. The rights of the complainant which were thus violated can be appropriately protected in equity in the manner decreed by the superior court with substantial justice to the parties. We think also that the relief granted is consistent with and reasonably within the scope of the complainant's third specific prayer that respondents be required to account for all moneys received from complainant. The superior court's award of money damages in the amount of the sums that were admittedly received by respondents, together with provision for an equitable lien on the real estate in the development of which the moneys have been expended is, in our opinion, a substantial compliance with that prayer.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*John C. McOsker*, for complainant.

*Higgins & Silverstein, John R. Higgins, Harrigan & Caulfield* of Boston, *Francis D. Harrigan*, for respondents.