In re Claire LOVE, Debtor.

Claire LOVE, Plaintiff,

v.

Grace LOVE, Defendant.

Bankruptcy No. 93–33469(2)13.
Adv. No. 94–3080.

United States Bankruptcy Court,
W.D. Kentucky.

May 5, 1995.

Philip Lanier, Louisville, KY.

William Lawrence, Trustee, Louisville, KY.

### MEMORANDUM–OPINION

J. WENDELL ROBERTS, Chief Judge.

This case was brought by the Plaintiff, Claire Love ("Plaintiff"), a debtor in a Chapter 13 Bankruptcy action, against her former spiritual advisor, Grace Love ("Defendant"). Plaintiff seeks by this lawsuit to recover large sums of money, totalling $156,261.00, transferred by Plaintiff to Defendant in the form of (1) class and retreat fees, (2) loans, (3) money spent on running Defendant's errands, (4) donations to Defendant and her religious center, and (5) mortgage payments made on farm property which Plaintiff owned jointly with Defendant and Defendant's husband. Plaintiff asserts that the payments at issue were the result of undue influence on the part of Defendant.

Plaintiff filed for protection under Chapter 13 of the Bankruptcy Code on November 12, 1993. She subsequently filed this adversary proceeding on September 9, 1994, which came on for trial on March 14 and 15, 1995. Having considered extensive testimony and exhibits introduced at trial, Defendant's deposition and arguments of counsel for the Plaintiff and arguments of Defendant, who represented herself, this Court finds that Plaintiff is entitled to recover $146,036.93, which constitutes payments made in the form of loans, money spent running Defendant's errands, and donations. Plaintiff is not entitled to recover her class and retreat fees. Nor is Plaintiff entitled to recover mortgage payments made for property in which Plaintiff possessed a property interest.

This Court sets forth its Findings of Fact and Conclusions of Law as follows.

### FINDINGS OF FACT

During the 1980's and early 1990's, Defendant was the spiritual leader, or "Guru," of a religious community known as an "ashram,"[1] located in Jefferson County, Kentucky. A "Guru" is a Sanskrit term meaning "enlightener." A Guru heads and directs an "ashram," the center where the Guru's followers come to learn from the Guru, meditate and perform services under the direction of the Guru.

Plaintiff is a 54 year old woman who lived under Defendant's guidance and direction at the ashram from 1989 until approximately October 1993. During that period, Plaintiff "embarked upon a spiritual journey to satisfy deep yearnings within herself to achieve a heightened state of spiritual bliss." Defendant taught that God chooses and sends a particular Guru to enlighten each of his followers (Plaintiff's Exhibit 5), and persuaded Plaintiff that she, Defendant, was the spiritual guide intended to assist Plaintiff in her spiritual pursuits.

### A. HISTORY OF PLAINTIFF'S RELATIONSHIP WITH DEFENDANT.

Plaintiff's relationship with Defendant began around 1986. Plaintiff was a professional artist living with her second husband and two youngest children in Massachusetts. Plaintiff's artwork completed prior to the commencement of her relationship with Defendant is presently displayed in museums,

[1]. "Ashram" is an Eastern term literally meaning "house of God."

hospitals, airports and other community centers throughout the world. It is clear from the evidence presented at trial that Plaintiff's artwork constituted a major part of her life during this period.

Plaintiff had experienced a state of spiritual bliss in the past. She sought to reattain that state and an acquaintance gave her Defendant's name and recommended her as a spiritual adviser. In response to Plaintiff's initial contact, Defendant travelled to Massachusetts where she met with Plaintiff and taught her various meditations. Thereafter, Plaintiff began travelling to Kentucky to attend Defendant's spiritual retreats. Through the fall of 1986, Plaintiff attended these retreats on an increasingly frequent basis, each time staying longer and longer periods at Defendant's ashram. Eventually, Plaintiff was in essence living there.

Plaintiff testified that by December 1986, she was in a deep "meditative space" that Defendant had assisted her in attaining. Plaintiff almost completely stopped eating, drinking and sleeping. She became so extremely physically weak that she was often unable to even speak, and was too weak to leave the ashram on her own. Plaintiff's parents and sister, who were living in Canada at the time, became alarmingly worried about Plaintiff's condition. Fearing Plaintiff was being held against her will, the family came to Louisville to get her, armed with a court order requiring her release to their custody.

During the months that followed, Plaintiff resided in Canada with her parents. Nevertheless, Plaintiff and Defendant maintained an ongoing telephonic contact, speaking with one another for hours at a time, several times a week. While Plaintiff initiated these phone calls, they were necessitated by Plaintiff's perceived reliance on Defendant's guidance. Defendant taught Plaintiff that Plaintiff needed to check with Defendant regarding all decisions Plaintiff made. Defendant advised Plaintiff that Plaintiff had not attained a high enough level of spirituality to trust her own internal directives. Defendant said, however, that she possessed the requisite spiritual guidance necessary for decision-making.

During this period, Defendant encouraged Plaintiff to divorce her husband and "develop an independence" from her family. Plaintiff's husband, upset by the "marital advice" given by Defendant to his wife, threatened to file a lawsuit against Defendant. Consequently, Defendant broke-off communications with Plaintiff out of fear of such a lawsuit.

Plaintiff eventually divorced her second husband and, in 1989, renewed her contact with Defendant. Plaintiff moved back to the ashram in Louisville and thoroughly entrenched herself in Defendant's teachings. Plaintiff became a "staff member in training." She resided at the ashram and devoted 24 hours a day to her religious pursuits under the direction of Defendant.

## B. DEFENDANT'S CONTROL OVER ALL ASPECTS OF PLAINTIFF'S LIFE.

By the time Plaintiff returned to the ashram in 1989, Defendant was representing that she had attained an even higher spiritual level. She had now taken on the titles "sai," the Sanskrit term for "saint," and "Guruji," meaning "Blessed Enlightener." She represented that she was only one of two or three individuals in the United States to attain such a spiritual level. Defendant testified that once she had attained this level, she was able to transmit blessings through her hands and feet.

Defendant demanded total reverence and respect. She instructed Plaintiff that she must "completely submit to" and "obey" her, as the Guruji, in order to become "pure" and "attain enlightenment." Defendant represented to Plaintiff that God spoke through her and that her words were the words of God. To question Defendant was to question God, himself. Defendant taught Plaintiff that "God's home" was wherever she, Defendant, was. Moreover, Defendant told her followers that there was a distinct possibility that she had been Buddha in a previous life, and in another previous life she witnessed the signing of the Constitution of the United States.

In this delusive atmosphere, Defendant supervised all aspects of Plaintiff's life. She

effectively controlled where Plaintiff lived, what Plaintiff wore, what Plaintiff ate, and how she spent her money. Defendant even advised Plaintiff to enter into a third marriage with another of Defendant's followers, a man by the name of Loving Peace,[2] and then subsequently advised Plaintiff to divorce him. Under Defendant's influence, Plaintiff even changed her name to Anubhava Loving Peace.

Defendant's control over Plaintiff pervaded all aspects of Plaintiff's life. Immediately upon Plaintiff's entrance into the ashram, Defendant cut off all of Plaintiff's contacts to the outside world. Defendant directed Plaintiff to cut off ties with her family, including her five children, the two youngest of which were only ages 12 and 13 at the time. Defendant instructed Plaintiff that the needs of the world outweighed the needs of her children and, appallingly, that they were old enough to care for themselves. Moreover, Defendant instructed Plaintiff that she was to have no friendships outside the ashram because they might distract her spirituality. Plaintiff was told that she could only associate with "enlightened sages" at the ashram.

Defendant also took possession of and sold Plaintiff's gold jewelry, which Plaintiff had intended for her children. Plaintiff never saw any of the proceeds from the sale of this jewelry and the Court was not informed as to its value or selling price.

Also of great interest, is the control Defendant exercised over Plaintiff's artwork. It was clear from the testimony presented at trial that a large part of Plaintiff's personal identity and self-worth was tied into her artwork. Prior to Plaintiff's return to the ashram in 1989, Defendant indicated that an art studio could be set up for Plaintiff at the ashram, so that Plaintiff could engage in the artwork which she loved. However, once Plaintiff returned to the ashram that never transpired. Instead, Defendant ordered that Plaintiff's artwork and equipment be stored in a trailer, and eventually ordered it to be sold. When the pieces of artwork did not sell, as it does not appear that Defendant had access to the proper market, Defendant *destroyed* Plaintiff's artwork. Again, the Court was not informed as to its value.

Defendant additionally ordered Plaintiff not to engage in further artwork, stating that Plaintiff's "ego" was caught up in it and that it was a hindrance to Plaintiff's religious pursuits. Defendant testified at trial that she simply did not like how Plaintiff acted when engaged in an art project. Defendant testified that Plaintiff became "snobbish" and spoke in an "affected" manner. It is clear to this Court that Plaintiff's artwork may have been the only realm in which Plaintiff retained even a modicum of self-respect. When this minor threat to Defendant's total domination of Plaintiff became evident to Defendant, she quickly put a stop to it. To insure that Plaintiff could not engage in further artwork, Defendant sold Plaintiff's art equipment, notably, at a fraction of its value. Again, Plaintiff never received any of the proceeds.

### C. DEFENDANT ENGAGED IN EMOTIONALLY ABUSIVE CONDUCT TOWARD PLAINTIFF.

The evidence presented at trial also established that Defendant engaged in conduct toward Plaintiff that can only be described as emotionally abusive in nature, the impact of which would have worn down the self-confidence and self-esteem of even an emotionally strong individual. As will be discussed below, the testimony of Plaintiff's therapist, Dr. Ann Weeks, established that Plaintiff was emotionally very weak; thus, this Court finds Plaintiff was particularly vulnerable to Defendant's abusive acts.

Plaintiff testified as to one instance when she and Defendant were travelling together to an out-of-town retreat. They were travelling in Plaintiff's van and Plaintiff was driving. Defendant became annoyed with Plain-

---

**2.** Plaintiff testified that she met Loving Peace at one of Defendant's retreats. Upon initially meeting, they engaged in a long embrace, during which they kissed and "tremendous energy flowed between them." Defendant suggested they rolled around on the floor together. This Court finds this line of questioning by the Defendant particularly disingenuous in light of Defendant's own testimony regarding the pleasures she experienced as the result of her own first orgasm.

tiff because the van had not been packed to her liking. Defendant's annoyance at Plaintiff escalated until, about an hour outside of Louisville, Defendant ordered Plaintiff to pull over on a rural, deserted road and ordered Plaintiff to get out of the van. Plaintiff had no money and no purse. She had only the clothes she was wearing, and it was beginning to get dark, as nightfall was approaching. Defendant told her she was going to leave her there and that she was to pray. Defendant advised Plaintiff that if she prayed hard enough God would help her find her way back. Defendant then drove off in Plaintiff's van, leaving her stranded there. Defendant returned a half hour later to find Plaintiff kneeling in the road praying. This Court notes the overwhelming distress that was caused to Plaintiff by Defendant's actions.

Plaintiff also testified to one occasion on which Defendant told Plaintiff that she did not know how lucky she was to be at the ashram and that she needed to be out on the streets to experience the awfulness of life outside the ashram. Defendant ordered Plaintiff to leave the ashram, but would not permit her to use the telephone to make any arrangements or to find another place to go. Plaintiff, of course, had no friends outside the ashram, and the shelters in Louisville were filled. Plaintiff had just enough money for a bus ticket to Clarksville, Indiana, where she was able to find a shelter. Defendant did not permit Plaintiff to return for three days.

Testimony at trial also established that Defendant deprived Plaintiff of the use of her own van during a lengthy period in the autumn of 1992. Defendant simply decided that Plaintiff did not "deserve the blessing of having a vehicle." Consequently, Defendant took the van for her own use, putting many miles on it by frequently driving it to out-of-town locations.

Defendant also frequently confined Plaintiff to her room at the ashram for long periods of time, particularly when there were followers of a "higher spiritual level" who were visiting the ashram for retreats or classes. Defendant told Plaintiff on these occasions that she had "distracting behavior," and should stay in her room so as not to "interfere." There was also testimony that Defendant frequently would not permit Plaintiff to accompany her and other ashram members to places outside the ashram, such as movies and restaurants, because Plaintiff was not deserving enough to go. Additionally, Defendant frequently forbid Plaintiff to even speak to her, telling her she had already heard everything she had to say. Clearly, this type of behavior was designed to wear down Plaintiff's self-confidence and to make her feel inferior.

Testimony at trial established that Plaintiff was deprived of any privacy from Defendant. Defendant directed Plaintiff not to lock her bedroom door in order that Defendant could enter her bedroom at anytime. Defendant frequently entered Plaintiff's bedroom in the middle of the night to roust Plaintiff from her sleep to run errands for Defendant or to meditate.

Finally, it appears that Defendant's emotionally abusive conduct continued even after Plaintiff moved out of the ashram for the final time and terminated all ties. This is demonstrated by a letter written by Defendant to Plaintiff following Plaintiff's departure from the ashram and the filing of this lawsuit. Defendant claimed in the letter to have developed a malignancy following Plaintiff's departure and blamed Plaintiff for "causing" it. Curiously, Defendant's malignancy was miraculously "cured" thereafter without any medical intervention.

Defendant's ill-treatment of Plaintiff was apparently so blatant that at one point another member of the ashram contacted the Kentucky Cabinet for Human Resources out of concern that Plaintiff was being mistreated and held against her will. Interestingly, Defendant got wind of the fact that the Cabinet was sending someone to investigate. In preparation for that visit, Defendant instructed Plaintiff as to what to wear, where to stand, how to greet them and what to say.

This Court finds that Defendant's emotionally abusive treatment of Plaintiff steadily destroyed Plaintiff's self-esteem and subjected Plaintiff to Defendant's emotional control in a manner not unlike that of an abused spouse. The Court further finds that Defen-

dant's behavior was part of a carefully calculated plot to gain absolute control over all aspects of Plaintiff's life, particularly Plaintiff's assets.

### D. UNDER DEFENDANT'S INFLUENCE PLAINTIFF GAVE DEFENDANT LARGE SUMS OF MONEY.

Over the duration of Plaintiff's and Defendant's relationship, Plaintiff paid to Defendant large sums of money, $156,261.00 of which Plaintiff now seeks to recover through this lawsuit. These payments fall into five basic categories: (1) payments for class and retreat fees; (2) loans to Defendant; (3) payments made by Plaintiff in the context of running errands for Defendant; (4) donations to Defendant for the ashram; and (5) mortgage payments made on farm property which Plaintiff owned jointly with Defendant and Defendant's husband.

#### 1. *Class and retreat fees.*

Shortly after Plaintiff's return to the ashram in 1989, Plaintiff paid to Defendant $4,478.00 as an advance for class fees. That amount covered the cost of Plaintiff's classes at the ashram for approximately a two year period. Thereafter, Defendant charged Plaintiff a rate of $100 per month for class fees. This Court has reviewed the itemization of payments submitted by both parties and finds that Plaintiff paid an additional amount of $3,695.02 for class fees and as a retainer fee for Defendant's teaching services.

#### 2. *Loans.*

The evidence presented at trial established that Defendant borrowed $4500.00 from Plaintiff for which Defendant executed a promissory note to Plaintiff (Plaintiff's Exhibit 4). To date, Defendant has paid Plaintiff $500.00 on this loan, and conceded at trial that she owes Plaintiff the remaining $4,000.00.

#### 3. *Errands.*

Plaintiff made many expenditures for Defendant's groceries, pharmaceuticals, postage, copying costs, dry cleaning, travel and other day to day requirements of Defendant.

Defendant taught her followers that it was a great privilege to be able to run errands for her and that such a privilege was reserved for only those followers who had reached a certain spiritual level.

Plaintiff was one of the few "privileged" followers who Defendant "permitted" to run errands for her. Plaintiff was expected to pay for the gas used in connection with this service. Moreover, while Defendant always agreed to reimburse Plaintiff for the money spent on the particular errands, she taught Plaintiff that it was disrespectful to request the money upfront. Thus, the result was that Defendant seldom reimbursed Plaintiff in full and frequently did not pay Plaintiff back at all. Plaintiff spent thousands of dollars on Defendant's errands, $2,737.17 of which has never been repaid.

#### 4. *Donations.*

During the course of Plaintiff's relationship with Defendant, Defendant manipulated Plaintiff into handing over to her many thousands of dollars. The testimony at trial established that Defendant told Plaintiff on numerous occasions that Plaintiff's purpose at the ashram was to provide for its financial well-being. Defendant would frequently call her followers together when she needed money. She would generally call them together at night and speak to them for hours about particular financial needs. The followers would then be required to engage in meditation sessions that would often continue over many hours, many times extending into the early morning hours of the next day in order to figure out how they each could contribute to obtaining the requested money. The testimony at trial established that when this occurred, Plaintiff almost always felt "called upon" to make a donation, and on the few occasions in which Plaintiff did not offer to make a donation, Defendant sent Plaintiff back to meditate some more.

Defendant utilized this approach to Plaintiff's detriment in October of 1990, when Defendant fenagled Plaintiff out of $39,000.00. Plaintiff's father died prior to her return to the ashram in 1989. Just after Plaintiff's return, Defendant claimed to feel

"moved" to buy a new building for the ashram, and established a building fund. Shortly thereafter, Plaintiff received the inheritance, in excess of $300,000.00, from her father's estate. In response to Defendant's directions to meditate with regard to obtaining money for the building fund, Plaintiff "was moved" to make a donation of $39,-000.00. In persuading Plaintiff to make this donation Defendant expressly represented that the money would be used in the purchase of a new ashram building and accepted the donation for that purpose. However, Defendant did not use these funds for a down-payment on a new building as Plaintiff intended. Instead, Defendant used Plaintiff's money to pay off her own personal credit card debts, to purchase clothes and to finance various trips.

There was additional testimony at trial as to instances in which Defendant played an even more active role in both controlling and obtaining Plaintiff's money. For example, Defendant directed Plaintiff to invest $15,-000.00 of the money she received from the divorce settlement with her second husband in a Certificate of Deposit. When the Certificate of Deposit matured, Defendant escorted Plaintiff to the bank and ordered her to pay $10,000.00 of the proceeds to Defendant. To avoid the gift tax which arises when gifts exceed $10,000.00 per year, Defendant directed the remainder of the proceeds be paid to another ashram member, with the intent that those funds would eventually be turned back over to Defendant. Plaintiff testified that she never saw any of those funds again.

On June 21, 1990, Defendant escorted Plaintiff to the bank and directed her to take out a loan for $9,000.00. Plaintiff followed Defendant's directives, as Defendant represented that these funds were to be used as a down-payment on a new building for the ashram. Defendant subsequently forced Plaintiff to roll this debt into a series of subsequent loans, that eventually grew to a total debt of $55,000.00. Again, although Plaintiff intended these funds to be used in the purchase of a new building, much of the funds were used instead by Defendant to finance trips, purchase clothes, and pay off Defendant's credit card debts.

Interestingly, on each trip to the bank, Defendant told Plaintiff what to wear, how to sit, and how to behave. Defendant instructed Plaintiff that they would meet with a Mr. Wayne Pulliam at the PNC branch where the ashram members did their banking, and that she, Defendant, would do all of the talking.

Eventually, a new building for the ashram was purchased. At approximately the same time, Plaintiff was entering into her third marriage, with Loving Peace, and decided she needed a residence separate from the ashram. Nevertheless, Plaintiff desired to stay in close proximity to the ashram and, accordingly, purchased the house next door to the new ashram. Defendant directed Plaintiff to take out a mortgage on that house to help Defendant with the down-payment on the ashram.

The house Plaintiff purchased was in need of renovation. The evidence at trial established that Defendant controlled those renovations by ordering Plaintiff to make elaborate design changes in the house in order that Plaintiff's personal residence could be used as temporary housing for retreat visitors. These renovations cost Plaintiff $137,-500.00. Plaintiff testified that she could have renovated the house to meet her personal needs for a maximum of $50,000.00.

Once the renovations were complete, Defendant began to utilize Plaintiff's home as a dormitory for Defendant's students. The students were charged rent; however, Defendant conceded at trial that the rent was often times paid late or only in part, and frequently was never paid at all. Moreover, the rent went directly to Defendant, who declared that her bills were to be paid first. If there was any rent money left over, that was the amount Plaintiff received. Accordingly, Plaintiff was often left with large utility bills that she could not pay.

Finally, Plaintiff testified at trial that Defendant instructed her to write a will leaving *"everything"* she owned to Defendant. Defendant then escorted Plaintiff to an attorney's office to have the will properly drafted and executed. Defendant tried unsuccessfully at trial to explain her actions as having been a "class exercise," designed to teach her

students about "surrendering to God." Defendant, however, did not tell her students that it was a class exercise. Moreover, this Court notes with particular interest that Defendant destroyed all of these wills, with the exception of one: the will belonging to Plaintiff, the only follower who had any money. Moreover, all of the other wills were handwritten by the followers. Plaintiff was the only follower who was taken by Defendant to an attorney to have her will formally drafted and executed!

Plaintiff subsequently revoked this will. However, the Court finds this incident particularly enlightening for the purposes of demonstrating both the tremendous control Defendant had over Plaintiff, as well as Defendant's true plan with regard to Plaintiff: i.e., obtaining all of Plaintiff's money.

### E. *TESTIMONY OF DR. ANN WEEKS.*

Dr. Ann Weeks testified on behalf of Plaintiff. Dr. Weeks is a family therapist who saw Plaintiff as a private patient seventeen times from May of 1994 through August of 1994. Dr. Weeks testified that when Plaintiff first came to see her following the termination of Plaintiff's relationship with Defendant, Plaintiff's emotional stability was in a "critical state," with Plaintiff functioning at the emotional level of a six or seven year old. Dr. Weeks testified that as a result of her experience at the ashram, Plaintiff was distraught; was suffering from fear, anxiety, sleeplessness, and panic attacks; and was "floundering psychologically." Dr. Weeks determined that Plaintiff was psychologically dependent on Defendant and the entire ashram environment.

Dr. Weeks testified that Plaintiff had very little "ego strength" of her own and that she was *incapable of declining Defendant's requests for money.* Dr. Weeks explained that Plaintiff's personalty is such that she is extremely susceptible to powerful figures. Plaintiff's father was a very powerful figure, as were her first two husbands. Likewise, Defendant was an extremely powerful figure. Dr. Weeks testified that Plaintiff *always* complied with the requests of powerful individuals. If she so much as questioned such a request, she was overcome by feelings of guilt and would often experience panic attacks.

According to Dr. Week's testimony, Plaintiff was susceptible to mere suggestions, even subtle suggestions. Thus, even Defendant's suggestions that Plaintiff pray and meditate over financial matters were perceived by Plaintiff as being "her responsibility."

Notably, Dr. Weeks testified that this personalty disorder would have been *readily apparent to someone trained in social work or psychology.* Interestingly, Defendant has received just that kind of training. She testified that she has a Bachelor's of Art in psychology and a Master's degree in social work. Moreover, Defendant testified that she has had a great deal of experience working with psychiatric patients.

Interestingly, Defendant's ability to control and manipulate Plaintiff became evident during Defendant's cross-examination of Plaintiff at trial. Plaintiff's entire manner and demeanor changed. Plaintiff acquired a "trance-like" manner and exhibited a fearfulness, characteristics which she had not previously displayed. Moreover, Plaintiff demonstrated quite a deference to Defendant.

### *CONCLUSIONS OF LAW*

#### I. *JURISDICTION.*

Plaintiff filed for protection under Chapter 13 of the Bankruptcy Code on November 12, 1993, and subsequently filed this adversary proceeding on September 9, 1994. Plaintiff listed her cause of action against Defendant as an asset in the Chapter 13 case. Accordingly, this Court has jurisdiction over this adversary proceeding per 28 U.S.C. §§ 157 and 1334.

Section 1334(a) grants the District Courts original and exclusive jurisdiction of all bankruptcy cases and proceedings under title 11, and Section 1334(b) provides that the District Courts shall have concurrent jurisdiction with the states "of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Section 157 provides that the District Courts may delegate any or all of the above-described types of cases to

the bankruptcy court for the district. Subsection (b)(1) specifically provides:

> Bankruptcy judges may hear and determine all cases under title 11 and all *core proceedings* arising in a case under title 11 ...

28 U.S.C. § 157(b)(1) (emphasis added).

Subsection (b)(2) sets forth the types of proceedings to be classified as "core proceedings."

This Court finds that this adversary proceeding is a "core proceeding" pursuant to both 28 U.S.C. § 157(b)(2)(A) and (O). These subsections provide:

> (2) Core proceedings include, but are not limited to—
>
> (A) Matters concerning the administration of the estate; ...
>
> (O) Other proceedings affecting the liquidation of the assets of the estate ...

28 U.S.C. § 157(b)(2)(A) and (O).

This adversary proceeding was listed as an asset of Plaintiff's Chapter 13 case. Thus, it is both a matter concerning the administration of the estate, 28 U.S.C. § 157(b)(2)(A), as well as a proceeding affecting the liquidation of the assets of the estate. Accordingly, this Court has jurisdiction over this proceeding.

## II. *PLAINTIFF IS ENTITLED TO RECOVER DONATIONS AND EXPENDITURES FOR DEFENDANT'S UNREIMBURSED ERRANDS, AS THESE WERE THE RESULT OF DEFENDANT'S UNDUE INFLUENCE.*

■ As the Kentucky Supreme Court has aptly stated in the past, "there is no fact more difficult to establish by direct evidence than fraud or undue influence." *Moore's Adm'r v. Edwards*, 248 Ky. 517, 58 S.W.2d 915, 918 (1933). However, there are certain situations that raise a strong suspicion of undue influence. Kentucky has long recognized that where two people stand in a relationship of trust and confidence, whereby one is capable of exerting a persuasive influence over the judgment of the other, a conveyance by the latter to the former will be set aside unless it can be demonstrated that the conveyance was voluntarily made. *Id.* The beneficiary of such a gift bears the burden of proving that the transaction was voluntary, free from undue influence, equitable and fair. *Id.* at 919; *Hightower v. Hightower*, 346 S.W.2d 748, 749 (Ky.1961).

■ Kentucky has never specifically addressed the issue of this type of conveyance in the context of a spiritual follower making a gift to his or her spiritual leader. Accordingly, this Court must look for guidance to the other jurisdictions which have been faced with this issue. A clear majority of those courts have held that a relationship of trust and confidence generally exists between a spiritual follower and his or her spiritual advisor. Accordingly, a conveyance from the spiritual follower to his or her spiritual advisor raises an inference of undue influence and places a burden on the spiritual advisor of proving that such influence was not exerted. *See In re The Bible Speaks*, 869 F.2d 628 (1st Cir.1989); *Brown v. Father Divine*, 173 Misc. 1029, 18 N.Y.S.2d 544, *aff'd*, 260 App.Div. 443, 23 N.Y.S.2d 116, *reh'g denied*, 260 A.D. 1006, 24 N.Y.S.2d 991 (1940); *Connor v. Stanley*, 72 Cal. 556, 14 P. 306 (1887); *Dowie v. Driscoll*, 203 Ill. 480, 68 N.E. 56 (1903); *Gilmore v. Lee*, 237 Ill. 402, 86 N.E. 568 (1908); *Klaber v. Unity School of Christianity*, 330 Mo. 854, 51 S.W.2d 30 (1932); *Nelson v. Dodge*, 76 R.I. 1, 68 A.2d 51 (1949); *McClellan v. Grant*, 83 App.Div. 599, 82 N.Y.S. 208, *aff'd*, 181 N.Y. 581, 74 N.E. 1119 (1905); 38 Am.Jur.2d, Gifts, § 94, p. 894; 14 A.L.R.2d 649 (1949).

■ It should be noted, however, that the mere existence of the spiritual advisor/client relationship does not by itself establish the existence of undue influence. *In re The Bible Speaks*, 869 F.2d at 642; *Whitmire v. Kroelinger*, 42 F.2d 699 (D.C.1930). The totality of the facts and circumstances must in addition support and strengthen the inference arising from that relationship. *The Bible Speaks*, 869 F.2d at 642; 14 A.L.R.2d at 653.

■ This Court, having reviewed the numerous cases from other jurisdictions addressing this matter, has compiled the following list of factors to be considered in deter-

mining whether a conveyance was the product of undue influence:

(1) Whether an actual relationship of trust and confidence existed between the spiritual advisor and the follower;

(2) The physical or mental condition of the follower;

(3) The follower's level of experience with financial matters;

(4) Whether the spiritual advisor advised the follower to seek independent advice prior to making the conveyance;

(5) Whether the spiritual advisor engaged in an active campaign of solicitation whereby he or she utilized his or her spiritual power to shame, frighten or otherwise induce a donor to make a gift;

(6) Whether there was a disposition of the follower's property to the spiritual advisor without any consideration of the follower's family;

(7) The extent of the gift in proportion to the follower's overall wealth; and

(8) Attempts by the spiritual advisor to isolate the follower from family and friends.

■ When these factors are applied to the case at bar, it is abundantly clear that Defendant exerted undue influence over Plaintiff and that the money expended by Plaintiff in the form of donations and in running Defendant's errands is a product thereof.

### A. AN ACTUAL RELATIONSHIP OF CONFIDENCE AND TRUST EXISTED BETWEEN PLAINTIFF AND DEFENDANT.

■ The relationship of the spiritual advisor and the follower must in actuality be a relationship of trust and confidence in order to support the inference of undue influence. *Whitmire*, 42 F.2d at 699; *Longenecker v. Zion Evangelical Lutheran Church*, 200 Pa. 567, 50 A. 244 (1901); *Umbstead v. Preachers' Aid Soc.*, 223 Ind. 96, 58 N.E.2d 441 (1944). In this case, it is clear that such a relationship did in fact exist between Plaintiff and Defendant.

There was an extremely close day-to-day contact between Plaintiff and Defendant.

Both Plaintiff and Defendant testified as to Plaintiff's tremendous reliance upon Defendant and her need to consult with Defendant on a daily basis regarding the most basic decision-making. Dr. Weeks confirmed this fact, testifying that Plaintiff was psychologically dependant on Defendant.

The testimony at trial established that Plaintiff confided in Defendant regarding all aspects of her personal life, including marital, family and financial matters. Moreover, Plaintiff followed Defendant's directives and submitted all aspects of her life to Defendant's control, because, according to Plaintiff's testimony, she believed in and trusted Defendant. Accordingly, Plaintiff permitted Defendant to control where she lived, what she wore, what she ate, when she married, when she divorced, as well as allowed Defendant to oversee her finances. From these facts, it is unequivocally established that Plaintiff placed great confidence and trust in Defendant.

### B. PLAINTIFF'S EMOTIONAL STATE MADE HER EXTREMELY SUSCEPTIBLE TO DEFENDANT'S SPIRITUAL DOMINANCE.

■ The physical or mental condition of the follower is a factor to be considered in determining whether undue influence is present. *Dowie*, 68 N.E. at 56; 14 A.L.R.2d at 661. It is not necessary that the donor suffer from a mental condition that would invalidate the gift on the basis of incompetency. *Dowie*, 68 N.E. at 56; 14 A.L.R.2d at 661. Rather, the court is directed to look for a mental condition "sufficient to indicate that the donor was thereby rendered more susceptible to a spiritual dominance ..." 14 A.L.R.2d at 661.

In the case at bar, Plaintiff clearly suffered from an emotional state that made her more susceptible to Defendant's control. Dr. Weeks testified that Plaintiff functioned at the emotional level of a six or seven year old at the time she left the ashram. According to Dr. Weeks, Plaintiff was "psychologically dependent" on Defendant, had little "ego strength" of her own, and was completely incapable of declining Defendant's requests.

Plaintiff's personality is such that she is extremely susceptible to powerful figures. In fact, Dr. Weeks explained, Plaintiff is susceptible to even the most subtle of suggestions from such persons. According to Dr. Weeks' testimony, Plaintiff would have been driven by Defendant's directives to pray and meditate over financial matters. If Plaintiff had so much as questioned Defendant's requests, she would have experienced guilt and panic attacks.

Moreover, this Court finds particularly enlightening Dr. Weeks' testimony that Plaintiff's personalty disorder would have been readily apparent to someone with Defendant's training and experience in social work and psychology.

### C. PLAINTIFF WAS COMPLETELY LACKING IN EXPERIENCE WITH FINANCIAL MATTERS.

The follower's inexperience with financial matters is additionally a factor which supports the inference of undue influence. *The Bible Speaks*, 869 F.2d at 642; *Eddy v. Eddy*, 281 Mass. 156, 183 N.E. 268, 269 (1932). In this case, Defendant, herself, gave extensive testimony regarding Plaintiff's inexperience with financial matters. Defendant testified that when Plaintiff came to the ashram, she had never even balanced her own checkbook or held a job. Plaintiff's family, as well as her first two husbands, were financially well-to-do. According to both Plaintiff's and Defendant's testimony, Plaintiff had always been financially taken care of and had never before been required to be responsible for her own finances.

Accordingly, this fact as well supports the inference of undue influence.

### D. DEFENDANT DID NOT ADVISE PLAINTIFF TO SEEK INDEPENDENT ADVICE BEFORE MAKING HER MONETARY GIFTS.

Religious leaders possess the capability of asserting a spiritual dominion over their followers. Consequently, many courts have held that before accepting a nontestamentary gift from a follower, religious leaders bear a duty to make certain that the follower has "had the benefit of competent and independent advice." 14 A.L.R.2d at 666; *The Bible Speaks*, 869 F.2d at 642; *Farmer v. O'Carroll*, 162 Md. 431, 160 A. 12 (1932); *Gilmore*, 86 N.E. at 568; *Lindley v. Lindley*, 67 N.M. 439, 356 P.2d 455 (1960); *In re Miller's Estate*, 16 Cal.App.2d 141, 60 P.2d 492 (1936). While this Court is reluctant to go so far as to recognize an actual duty on behalf of the religious advisor to see that the follower has actually consulted with an independent and competent person prior to giving such a gift, it is certainly a factor that may be considered in determining whether the gift was the product of undue influence. A failure to show that the follower had the benefit of such independent and competent advice will weigh heavily in support of the inference of undue influence.

In this case, Defendant conceded that she never advised Plaintiff to seek independent advice prior to making the donations and gifts of money at issue. In fact, Defendant testified that she did not question her followers' financial ability to make the donations they gave, and did not advise members of the ashram to seek financial advice before giving such donations. Accordingly, this factor weighs heavily in support of the inference of undue influence, as any independent advice that Plaintiff would have had the benefit of would have helped to counterbalance the dominance and control Defendant exercised over Plaintiff.

### E. DEFENDANT ENGAGED IN AN ACTIVE CAMPAIGN OF SOLICITATION.

An active campaign of solicitation whereby the spiritual advisor uses her spiritual power to shame, frighten or otherwise induce a follower to make a gift is a factor that weighs heavily in support of a finding of undue influence. *Hensley v. Stevens*, 156 Mont. 486, 481 P.2d 694 (1971); *Nelson*, 68 A.2d at 51; *Whitmire*, 42 F.2d at 699. This is especially true where the pressures exerted on the follower are on a personal, individual basis, as opposed to a general plea from the pulpit to the congregation as a whole. *Roberts–Douglas v. Meares*, 624 A.2d 405, *modified on other grounds and reaff'd*, 624 A.2d 431 (D.C.App.1992).

In this case, Defendant engaged in a constant campaign to solicit money from Plaintiff. She repeatedly told Plaintiff that her duty to God was to provide for the financial support of the ashram. This Court notes the tremendous impact this had on Plaintiff due to the fact that Defendant had taught Plaintiff that her words were the words of God. The Rhode Island Supreme Court found that to be a highly persuasive fact in *Nelson v. Dodge,* 76 R.I. 1, 68 A.2d 51 (1949), where the Court held that donations from the plaintiff to his spiritual advisor had been the product of undue influence. As in the case at bar, the religious leader who was the defendant in the *Nelson* case had taught his followers that his words were messages from God. He furthermore advised the plaintiff that God wanted him to turn over his material possessions to the church. *Id.*

In this case, Defendant spoke to Plaintiff on a daily basis about the financial needs of the ashram. Defendant regularly called the followers together to talk to them about financial matters. She would speak to them frequently for hours on end and would then instruct them to engage in meditation sessions that would often last for many hours. The testimony established that there were instances in which Defendant sent Plaintiff back to meditate some more when she failed to come forward with the offer of a donation.

Moreover, the testimony established that Defendant frequently asked Plaintiff for loans of money, for significant donations, took Plaintiff with her when she looked at property she wished purchased for the ashram, and took Plaintiff to the bank on numerous occasions instructing Plaintiff to take out loans for the ashram, which eventually grew to a total debt of $55,000.00.

Defendant also succeeded in convincing Plaintiff to turn over a large portion of her material possessions, including her art equipment and jewelry, shortly after her arrival to the ashram in 1989. Defendant's efforts to obtain Plaintiff's material possessions continued throughout her relationship with Plaintiff. This is most effectively demonstrated by Defendant's success in instructing Plaintiff to write a will giving everything she owned to Defendant and then escorting Plaintiff to the lawyer's office for the purpose of having it executed.

Clearly, Defendant engaged in an almost daily campaign to obtain Plaintiff's money and material possessions.

This Court wishes to emphasize the distinction between the type of conduct in which Defendant engaged and the typical fund raising campaigns in which main-stream churches generally engage. Churches typically make a general plea from the pulpit to the congregation at large. The preacher does not generally follow his or her members home, have access to their private bedrooms, roust them at all hours, control most if not all of their daily lives, and speak to them day after day, hour after hour regarding the church's financial needs.

### F. *DEFENDANT CONVINCED PLAINTIFF TO MAKE DISPOSITIONS OF HER PROPERTY WITHOUT ANY CONSIDERATION OF PLAINTIFF'S FAMILY.*

█ An additional factor that weighs heavily in support of the inference of undue influence is a disposition of the follower's property to the spiritual leader "without any consideration of the donor's family." 14 A.L.R.2d at 677; *See Gilliam v. Schoen,* 176 Or. 356, 157 P.2d 682 (1945); *West v. Iowa Seventh Day Adventist Ass'n.,* 194 Iowa 390, 189 N.W. 765 (1922); *Ford v. Hennessy,* 70 Mo. 580 (1879). This is especially true where the spiritual leader, knowing or suspecting that the family has not been provided for, fails to suggest that provision be made for the family. *West,* 189 N.W. at 765; *Ford,* 70 Mo. at 580.

In this case, Defendant convinced Plaintiff to make numerous dispositions of her property without any consideration of Plaintiff's family. Most significantly, Defendant convinced Plaintiff to give her the gold jewelry Plaintiff had intended for her children, and ultimately convinced Plaintiff to write a will giving *everything she had* to Defendant, with absolutely no provisions for any of her family members, including her five children. This Court finds particularly enlightening Defendant's testimony with regard to Plaintiff's

will. Defendant testified that the good of giving to God outweighed the good of giving to individual family members. Moreover, Defendant testified, Plaintiff's family members had not treated Plaintiff very well, so it made more sense for Plaintiff to leave everything to Defendant and the ashram.

This factor weighs heavily in support of a finding of undue influence.

### G. PLAINTIFF GAVE TO DEFENDANT OVER ONE–THIRD OF HER WEALTH.

 In determining the existence of undue influence, several courts have considered the extent of the follower's gift in proportion to his or her overall wealth. *The Bible Speaks*, 869 F.2d at 642; *Slater v. Munroe*, 316 Mass. 129, 55 N.E.2d 15 (1944); 14 A.L.R.2d at 661. The greater the proportion of the gift, the stronger the presumption. *The Bible Speaks*, 869 F.2d at 642, *Slater*, 55 N.E.2d at 15; 14 A.L.R.2d at 661.

In this case, when Plaintiff entered the ashram she had approximately $15,000.00 to $20,000.00 from the divorce settlement with her second husband. Subsequently, Plaintiff inherited approximately $300,000.00 from her father, bringing the total of her financial resources to approximately $320,000.00. Of this amount, Plaintiff gave Defendant $146,036.93, in the form of donations, loans that have yet to be repaid and as expenditures on Defendant's errands that were never repaid. Hence, Plaintiff gave to Defendant over one-third of her wealth. This too strengthens the inference of undue influence.

### H. DEFENDANT ISOLATED PLAINTIFF FROM HER FRIENDS AND FAMILY.

The final factor this Court will consider is an attempt by the spiritual leader to isolate the follower from his or her friends and family. *The Bible Speaks*, 869 F.2d at 642. In this case, Defendant conceded at trial that she discouraged Plaintiff from maintaining contacts with her family, including Plaintiff's two youngest children, ages 12 and 13. Defendant explained at trial that the needs of the world outweighed the needs of Plaintiff's children. Moreover, the testimony at trial

established that Defendant instructed Plaintiff that she was to have no friendships outside the ashram. This factor additionally weighs heavily in support of a finding of undue influence, as the concern and advice of Plaintiff's family and friends would have helped to somewhat diffuse the dominance and control Defendant exercised over Plaintiff.

### III. PLAINTIFF IS ALSO ENTITLED TO RECOVER THE DONATIONS DESIGNATED FOR THE PURCHASE OF A NEW ASHRAM BUILDING BUT WHICH WERE NOT SO USED, ON THE THEORY OF FRAUD.

 Plaintiff's right to recover donations in the amount of $39,000.00, which were designated for the purchase of a new ashram building but which were not so used, is also supported on a theory of fraud. Actual fraud includes any "deceit, artifice, trick or design ... used to cheat another—something said, done or omitted with the design of perpetrating ... a cheat or deception." *In re Todd*, 34 B.R. 633 (Bankr.W.D.Ky.1983). To prevail on such a claim, Plaintiff must establish the five required elements comprising this offense: (1) Defendant made a representation; (2) Defendant knew the representation to be false at the time it was made; (3) the representation was made with the intention of deceiving Plaintiff; (4) Plaintiff relied on the representation; and (5) Plaintiff sustained loss and damage as the proximate result of the representation. *Id.* at 636; *Scott v. Farmers State Bank*, Ky., 410 S.W.2d 717, 720 (1966).

This Court, upon reviewing the totality of evidence presented in this case, finds that the five elements of fraud have been proven by clear and convincing evidence. Subsequent to Plaintiff learning that she had inherited approximately $300,000.00 from her father, Defendant represented that she needed donations for the purchase of a new building for the ashram. Defendant directed Plaintiff to meditate with regard to obtaining money for this purpose and represented to her that any donations Plaintiff felt "moved" to make would be used therefor. Defendant

conceded at trial, however, that she knew she could not purchase a new ashram building until her credit card debts were paid-off because she could not qualify for the necessary bank loan. Nevertheless, this Court finds, Defendant made representations to Plaintiff that her donations would be used to purchase a new building, in order to induce Plaintiff to make a donation. Plaintiff relied on Defendant's representations and donated $39,-000.00, with the expressed intention that the donation be used in the purchase of a new ashram building. Defendant accepted the donation for that purpose, knowing, however, that she was not going to use the money in that manner. Instead, Defendant utilized Plaintiff's donation to pay off her credit card debts, to purchase clothes and to finance various trips.

Accordingly, this Court finds that Plaintiff's claim for the recovery of her $39,000.00 donation is additionally supported on a theory of fraud.

#### IV. *CLASS FEES AND RETAINERS.*

■ This Court finds that Plaintiff received adequate consideration for the class fees and retainers charged by Defendant for her teaching services. This Court has reviewed the itemizations filed by the parties and finds that Plaintiff paid a total of $8,173.02 for such services. It does not appear to this Court that these payments were the result of undue influence. Plaintiff simply paid for classes which she then attended. Accordingly, Plaintiff is not entitled to recover these payments.

#### V. *PLAINTIFF IS NOT ENTITLED TO RECOVER MORTGAGE PAYMENTS MADE ON FARM PROPERTY WHICH SHE OWNED JOINTLY WITH DEFENDANT AND DEFENDANT'S HUSBAND.*

■ Lastly, Plaintiff seeks to recover mortgage payments made on farm property known as Presence Mountain, located at Irvington, Breckinridge County, Kentucky. Plaintiff owned a one-third interest in this property, with Defendant and her husband owning the remaining two-thirds interest. Upon reviewing the itemizations submitted by the parties, this Court finds that Plaintiff paid $2,000.00 in mortgage payments on this property. In addition, this Court notes that Plaintiff made unreimbursed payments totalling $51.05 for new hinges, whitewash and straw for the farm property. This Court concludes that these constitute payments for Plaintiff's own property and, thus, inured to the benefit of Plaintiff as well as Defendant. Accordingly, Plaintiff is not entitled to recover these amounts.

#### CONCLUSION

In sum, for the above-stated reasons, this Court concludes that Plaintiff is entitled to recover (1) all sums expended on donations, (2) unreimbursed expenditures incurred in running Defendant's errands, and (3) the $4,000 Defendant concedes she owes Plaintiff pursuant to the promissory note introduced as Plaintiff's exhibit 4 at trial. These sums total $146,036.93. Plaintiff may not recover the $8,173.02 in class fees and retainers. Nor may Plaintiff recover the $2,051.05 in mortgage payments and expenditures on the farm property in which she possessed an ownership interest. This Court shall enter a separate Order to this effect.

#### *ORDER*

Pursuant to the attached Memorandum–Opinion,

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff, Claire Love's, claim of undue influence in connection with (1) all sums expended on donations, and (2) unreimbursed expenditures incurred in running Defendant's errands, is SUSTAINED and judgment be, and hereby is, entered on behalf of Plaintiff in the amount of $142,036.93.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff, Claire Love's, claim for $4,000.00 which Defendant concedes she owes Plaintiff pursuant to the promissory note introduced as Plaintiff's Exhibit 4 at trial, is SUSTAINED and judgment be, and hereby is, entered on behalf of Plaintiff in that amount.

IT IS HEREBY FINALLY ORDERED AND ADJUDGED that Plaintiff, Claire Love's, claim of undue influence in connec-

tion with (1) the $8,173.02 expended by Plaintiff in class fees and retainers, and (2) the $2,051.05 expended by Plaintiff in mortgage payments and expenditures on farm property known as Presence Mountain, located in Irvington, Breckinridge County, Kentucky, be, and hereby is, DISMISSED.

Defendant, Grace Love, shall make all payments pursuant to this judgment directly to William H. Lawrence, the Chapter 13 Trustee.

This is a final and appealable judgment, there being no just cause for delay.